EDMONDS, J.
 

 The defendant appeals from a judgment determining that he is the father of a child born to Daniela Aráis. The principal contention of the appellant is that the judgment must be reversed because the results of a blood test, received in evidence, show his nonparentage; in other words, that the medical evidence is conclusive upon the question.
 

 The mother of the child testified that she met the defendant in November, 1930, and at his request moved to a different house for which he paid the rent and bought the furniture and equipment—“furnished everything I needed to keep myself and children”. The defendant, she said, came to her home at least twice a week during the next three years and had frequent relations with her. The child was born in November, 1932. She testified that after the birth of the child, “I quit my job at the restaurant at defendant’s request and upon his promise to support me”. Thereafter she moved to another location. The defendant, she said, “continued to pay my rent and support me. He usually brought groceries with him when he came. He arranged at the store ... to let me have groceries or anything I needed on his credit. . . . This arrangement . . . continued until
 
 *430
 
 in February, 1936, when defendant refused to support me any more or support Elsie. . . . When defendant came to see me after the baby was born he would hold it and later when she was older he would take her to the playground. He always brought something for the baby. Later he took the baby and had her picture taken. . . . Before the baby was born defendant asked me not to say that he was the father of the child but to use another name. He said he would support the child and make a nice home for her. ’ ’
 

 A number of witnesses declared that they saw the defendant at the mother’s home on many occasions and that he either “always” or “often” brought a basket or bundle with him. Two witnesses testified that the defendant told each of them that he was the baby’s father. Others said that at Various times they had seen him carrying the baby from the mother’s house. A nurse who eared for the mother at the birth of the child testified that the defendant paid her for her work and that on several occasions while she was in the house the defendant came and brought groceries and clothing for the baby. The grocer named by the mother as having supplied her with food said that he had done so for about two years, commencing early in 1934, at the request of the defendant, who always paid the bills.
 

 The defendant testified that he was never at the home of the mother and had never had any relations with her; “ [I] do not know her.” He declared that he gave her no groceries or furniture, but “at one time” felt sorry for her and told the grocer to give her some food. As part of his defense he applied to the court for the appointment of a physician to make a bloodgrouping test of the mother, the child, and himself. This application was granted upon the consent of the mother. The blood test was made by a physician selected by the court, who thereafter testified that, according to the doctrine of such tests, the defendant is not the father of the child.
 

 In recent years, what is generally called the Landsteiner or Bernstein blood-grouping test, has been presented to the courts as evidence in paternity cases. This test is predicated upon the medical theory that the red corpuscles in human blood contain two affirmative agglutinating substances, and that every individual’s blood falls into one of four classes and remains the same through life. According to the Mendelian law of inheritance, this blood individuality is an hereditary
 
 *431
 
 characteristic which passes from parent to child, and no agglutinating substance can appear in the blood of a child which is not present in the blood of one of its parents. (Tale Law Journal, vol. XLIII, p. 651.) According to the testimony of the physician in this case, the blood of the child ‘ ‘ contains the agglutinogen B which is not present in the blood of the mother and therefore must have been present in the blood of the father”, but the blood of the defendant does not contain this element. The physician also said that “the factors A and B cannot appear in the blood of the child unless present in the blood of one or both parents”, and that therefore, if the child was born to Daniela Aráis, the defendant cannot be the father.
 

 The blood test as legal evidence has apparently been considered by only one American court of last resort,
 
 State
 
 v.
 
 Damm,
 
 62 S. D. 123 [252 N. W. 7, 104 A. L. R. 430]. The defendant was charged with rape resulting in the birth of a child. At the trial he offered to be tested and asked the court to require the prosecutrix and the child to undergo the same test. The request was denied and it was held that there had been no abuse of discretion. In the opinion upon rehearing 64 S. D. 309, 266 N. W. 667, the court extensively reviewed the medical literature on the subject of blood tests, but adhered to its former ruling “to the effect that the trial court did not err in refusing to make the order requested”. This case therefore, passes upon an entirely different question from the one here presented.
 

 Considered as legal evidence, the blood test is expert opinion because the conclusions reached by the examiner are based upon medical research and involve questions of chemistry and biology with which a layman is entirely unfamiliar. (1 Univ. of Chicago Law Review, 798 (1934).) The complex biological processes on which the inferences of paternity are made by experts are reviewed and discussed at length by Professor Wigmore in the 1934 Supplement to his work on Evidence. He says that in the present state of scientific discovery, it is generally accepted that the test can be used only negatively; that is, to show that a particular man is not the father of a particular child. He also presents tables showing the probabilities of proving nonpaternity when the blood group of a wrongfully accused man is known, and concludes that tests for negative proof “may after all not be determinative in a given case.” (P. 58.)
 

 
 *432
 
 Whatever claims the medical profession may make for the test, in California “no evidence is by law made conclusive or unanswerable unless so declared by this code”. (Sec. 1978, Code Civ. Proc.) Expert testimony “is to be given the weight to which it appears in each case to be justly entitled”.
 
 (State Compensation Ins. Fund
 
 v.
 
 Industrial Acc. Com.,
 
 195 Cal. 174 [231 Pac. 996].) The law makes no distinction whatever between expert testimony and evidence of other character.
 
 (Treadwell
 
 v.
 
 Nickel,
 
 194 Cal. 243 [228 Pac. 25].) Although it encourages the demonstration of the truth of the issues before a court by any means which are generally accepted as tending to prove the facts in dispute, “when there is a conflict • between scientific testimony and testimony as to facts, the jury or trial court must determine the relative weight of the evidence”.
 
 (Rolland
 
 v.
 
 Porterfield,
 
 183 Cal. 466 [191 Pac. 913].)
 

 These are fundamental rules which are firmly embedded in the law of evidence. However, the appellant contends that an exception has been made of medical testimony by the decision in
 
 William Simpson Const. Co.
 
 v.
 
 Industrial Acc. Com.,
 
 74 Cal. App. 239 [240 Pac. 58, 59], and cases which have followed it, and relies particularly upon a statement in the Simpson case to the effect that medical evidence is, in certain cases, “conclusive upon the question in issue”. There the cause of death was in dispute. A workman fell from a scaffold and an autopsy performed by two physicians showed a hemorrhage in his brain and a fracture of his skull. Each physician testified that, in his opinion, a stroke of apoplexy caused the hemorrhage prior to the fall and was the cause of death. The Industrial Accident Commission disregarded this testimony and found that death resulted from the fractured skull. In reviewing the case the court discussed the effect of medical evidence “where the subject is one for experts or skilled witnesses alone”, and held that “the Commission was not bound by the opinion of the medical experts that the proximate cause of the death of the deceased was the stroke of apoplexy”. However, it annulled the award because there was no evidence of any kind tending to prove that death resulted from the fall. The decision is, therefore, directly contrary to the position of the appellant here, although some of the language of the opinion taken out of context seems to support it.
 

 In discussing the subject of expert testimony in the Simpson case, the court cited several eases in which damages were
 
 *433
 
 claimed because of the alleged malpractice of a physician, and then said: “The rule to be drawn from these decisions, as we understand them, appears to be that whenever the subject under consideration is one within the knowledge of experts only, and is not within the common knowledge of laymen, the expert evidence is conclusive upon the question in issue. It follows that in such eases, neither the court nor the jury can disregard such evidence of experts, but, on the other hand, they arc bound by such evidence, even if it is contradicted by nonexpert witnesses.” (P. 243.) The general rule is that the law does not require expert testimony to be offered wherever relevant. Malpractice cases are an exception. In such a case the plaintiff must prove by members of the defendant’s profession the standard of care or skill ordinarily used in the practice of that profession at a particular place.
 
 (Perkins
 
 v.
 
 Trueblood,
 
 180 Cal. 437 [181 Pac. 642];
 
 Callahan
 
 v.
 
 Hahnemann Hospital,
 
 1 Cal. (2d) 447 [35 Pac. (2d) 536].) The reason for the exception is obvious. Only physicians who practice their profession at a particular place could have any knowledge of the method of treatment customarily used by the other members of the profession practicing there; the subject, therefore, calls for expert opinion only. But the testimony of an expert in such a case is not conclusive in the sense that it must be accepted as true. Indeed, there is often considerable disagreement between different witnesses concerning the standard of care or skill ordinarily used and the trier of fact must resolve the conflict thus raised. It is conclusive, however, to the extent that it may not be contradicted by the testimony of a non-expert witness.
 

 In
 
 Hines
 
 v.
 
 Industrial Acc. Com.,
 
 215 Cal. 177 [8 Pac. (2d) 1021], the uncontradicted testimony of a physician concerning the cause of a physical disability was said to be conclusive. In
 
 Hartford A. & I. Co.
 
 v.
 
 Industrial Acc. Com.,
 
 140 Cal. App. 482 [35 Pac. (2d) 366], an award of compensation for an alleged injury was annulled because, in the opinion of the physicians who testified, the appellant’s disability had not been caused by his employment, and the expert evidence was held to be conclusive upon the question. It is clear that there is nothing in these cases or the Simpson case which supports the contentions of the defendant that the medical evidence presented on his behalf must be accepted as conclusive. Parentage is not exclusively a
 
 *434
 
 subject for expert evidence. The trial judge heard the testimony of the mother of the child and the witnesses who corroborated her concerning the numerous visits of the appellant to her home, and his actions with the child. The admissions of the defendant as related by these witnesses are also a part of the evidence. It was the duty of the judge to determine the fact of parentage upon all this evidence and to resolve the conflict arising from the testimony of the mother and her witnesses on the one hand and the evidence of the defendant, including the blood test, on the other. The finding so made was based upon substantial evidence and may not be successfully challenged upon appeal.
 

 In the birth certificate, the mother caused John Morales to be named as the father of the child; but this does not raise an estoppel against her and require a reversal of the judgment, as the defendant contends. There is no evidence that she led the defendant to believe that this statement was true. On the contrary, the record supports the implied finding of the trial judge that she gave a fictitious name for the father at the request of the defendant and for the purpose of protecting him.
 

 As there is ampTe evidence to support the finding of parentage, the trial judge did not abuse his discretion in denying the motion for a new trial. Also, as section 196a of the Civil Code requires a father to support his child, the trial court had power to order him to pay attorney’s fees in the action brought to enforce that obligation. The amount which the defendant was ordered to pay is not excessive in view of the evidence concerning his financial ability and was properly allowed.
 
 (Paxton
 
 v.
 
 Paxton,
 
 150 Cal. 667 [89 Pac. 1083].)
 

 The judgment is affirmed.
 

 Shenk, J., Seawell, J., Waste, C. J., Langdon, J., and Nourse, J., pro
 
 tem.,
 
 concurred.
 

 Reporter’s Note.—On January 25, 1938, a rehearing was denied by the Supreme Court and the opinion was corrected to read as above reported.