[Civ. No. 12917. First Dist., Div. Two. Apr. 22, 1946.]

ISABEL B. CLOUD et al., Appellants, v. MARKET STREET RAILWAY COMPANY (a Corporation) et al., Respondents.

A. Don Duncan for Appellants.

Cyril Appel and Ivores R. Dains for Respondents.

DOOLING, J.—In an action for wrongful death tried to the court without a jury judgment went for the defendants. The plaintiffs, the widow and nine-year-old child of the decedent through her guardian *ad litem,* have taken this appeal.

Decedent was a conductor employed by the respondent Market Street Railway Company (hereafter called the com-

pany). He was off duty at the time of his death and was killed at about 3:42 a. m. on March 21, 1939, by being crushed under the front end of a streetcar of the respondent company at the terminal of its No. 5 and No. 7 lines near the ocean beach in San Francisco. At that point the cars of the two lines run around separate loops and the company maintains a shelter or station for intending passengers. It is equipped to be lighted at night by overhead lights but it was the practice of the company to extinguish these lights at about 2 a. m. and the lights were extinguished at the time that decedent met his death. The night was dark and the place of the casualty was not illuminated in any way. The car which struck decedent was a No. 7 car and was just coming to a stop when the impact with his body was felt by the motorman. His body was found under the front end of the car lying across the rails and the front wheels of the car had not passed over it.

The headlights of the car did not illuminate the tracks ahead of it as the car proceeded around the loop, being thrown off to the outer side. The motorman testified that in addition to the headlights the car was equipped with "dash lights" which did illuminate the rails for a distance of about 10 feet in front of the car, that he was watching the track ahead of the car and saw nothing, that he heard a slight bump at the left front door of the car and almost simultaneously felt a bump under the front platform and brought the car to a stop.

A post mortem examination of decedent's blood showed the presence of .35 of one per cent of ethyl alcohol. Dr. Carr, pathologist at the San Francisco coroner's office, testified that a person with that percentage of alcohol in his blood would be stuporous, comatose and unable to move, that there are people who could be ambulatory with that amount of alcohol in the blood, although the witness had never seen one. Mr. Swim, toxicologist to the coroner, who had made the examination of decedent's blood, testified under the circumstances hereinafter noted, that most people with that amount of alcohol in the blood would be ambulatory, although some would be comatose and unable to move.

Decedent had a pass, as an employee of the company, which entitled him to transportation on any of its cars.

Appellants' main contention is that the evidence does not support the judgment, or to put it affirmatively, that the evidence is such as to require a judgment for plaintiffs as a

matter of law. Briefly put appellants contend that the evidence compels the following findings: that decedent at the time of his death was a passenger to whom the company owed the highest care; that he was lying on the track so incapacitated from drink that he could not move and was completely helpless and unconscious; and that the failure to have the station lighted or to observe decedent's position of peril establishes defendants' negligence as a matter of law.

It is an integral part of their argument that the competent evidence before the court will support no other finding of decedent's condition than the one that he was so overcome by the effects of liquor at the time of his death as to be deprived of his senses and his ability to move, that he was lying on the track senseless and helpless. In assaying this contention we must, of course, apply the accepted rule on appeal that if there is any substantial, competent evidence to support the judgment of the trial court that evidence must be accepted and every reasonable favorable inference to be drawn therefrom must be indulged. (*Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]; *Juchert* v. *California Water Service Co.*, 16 Cal.2d 500, 503 [106 P.2d 886].)

If the testimony of the motorman was believed by the trial court decedent was not lying on the track ahead of the car before the impact, the motorman's testimony being that he was watching the track which was illuminated for 10 feet ahead of the car by the "dash lights" and did not see the decedent at any time before the impact. These facts plus the motorman's testimony of a bump at the left front gate will support the inference that decedent was at the side of the car in a standing position and was thrown by collision with the gate under the slowly moving car. While the motorman's testimony was given under Code of Civil Procedure, section 2055, it was none the less evidence in the case to be weighed with all the other evidence in determining the issues of fact. (*Smellie* v. *Southern Pacific Co.*, 212 Cal. 540, 559 [299 P. 529]; *Joseph* v. *Vogt*, 35 Cal.App.2d 439, 441 [95 P.2d 947]; *Figari* v. *Olcese*, 184 Cal. 775, 782 [195 P. 425, 15 A.L.R. 192].)

Appellants attack the credibility of the motorman's testimony that he heard a bump at the front gate, on the ground that neither in his report, his previous testimony or otherwise prior to the trial, had he ever mentioned this fact.

These were matters for the trial judge to consider in weighing the testimony and the judge in his discretion was entitled to believe the motorman's testimony given at the trial.

Appellants' position is that Dr. Carr's testimony establishes conclusively as a scientific fact that decedent could not have been ambulatory at the moment of collision. To this there are several answers. In the first place Dr. Carr testified that some persons in decedent's physical condition could be ambulatory. In the second place the motorman's testimony, as we have shown, will support a finding that decedent was in fact ambulatory. Expert testimony is not conclusive and may be controverted by lay testimony establishing inconsistent facts. (*Arais* v. *Kalensnikoff*, 10 Cal.2d 428 [74 P.2d 1043, 115 A.L.R. 163].) Finally the testimony of Dr. Carr as an expert was contradicted substantially by that of Mr. Swim, hereinafter more fully discussed.

If there is any doubt whether a person who is dead drunk and unable to move can be guilty of contributory negligence (see *Coakley* v. *Ajuria*, 209 Cal. 745 [290 P. 33]) there is none that an ambulatory person in a state of intoxication can be guilty of contributory negligence and is held to the standard of care of an ordinarily prudent person. (*Emery* v. *Los Angeles Ry. Corp.*, 61 Cal.App.2d 455, 461 [143 P.2d 112] ; *Brkljaca* v. *Ross*, 60 Cal.App. 431, 438 [213 P. 290] ; 38 Am.Jur. 883; 45 C.J. 997.)

The trial court found that decedent was guilty of negligence which proximately contributed to his injuries and death. If, as the trial court was entitled to infer, decedent while standing or walking near the track permitted the car, which he must or should have seen slowly approaching, to strike him, this finding is fully supported by the evidence. Since there was no question of last clear chance in the case this finding alone is sufficient to support the judgment and we need not discuss the questions of decedent's status as a passenger or defendants' negligence.

Appellants called as their witness Mr. Swim, the toxicologist to the coroner of the city and county of San Francisco. On direct examination Swim testified that he made an examination of the decedent's blood, which showed the presence therein of .35 of one per cent of ethyl alcohol. On cross-examination Swim was asked: "What does that indicate to you, when you make that test and you determine that there

was 0.35 of one per cent of ethyl alcohol in the blood?'' After objection that this was not proper cross-examination the respondents made Swim their own witness. After some preliminary questions as to his qualifications respondents' counsel asked Swim:

''Will you tell us what effect—what is the effect of 0.35 of one per cent of ethyl alcohol in the blood stream, as found in this particular case, as found in the living person?''

Over objection ''that the proper foundation has not been laid'' the witness was allowed to answer:

''0.35 of one per cent to the average individual—when I say that is the general rule—when I say the average individual, the man is under the influence of alcohol to the point where he is considered drunk.''

It may be here pointed out, in view of appellants' arguments upon this question, that this was the only opinion answer given by the witness before he was taken over for cross-examination by counsel for appellants, and that in this answer the witness did not purport to designate the extent or degree of intoxication which would be induced by the presence of .35 of one per cent of ethyl alcohol in the human blood.

On cross-examination counsel for appellants asked the witness: ''As a matter of fact, a man with that much alcohol is dead drunk, isn't he? . . . I mean dead drunk so that he can't even walk.'' This elicted the answer:

''My answer to that, first, is no, for this reason: as a general statement that would hold true, but 0.35 of one per cent some people may be under the influence of alcohol and drunk to such an extent they are down. The general rule, however, is that a man having 0.35 of one per cent is not comatose. He is able to get around. Of course he is dazed. He falls down a good deal; he is belligerent; he is ill. Although on occasions you will find some that are affected just a little bit more.''

After an extended cross-examination which developed testimony of the witness that there is a wide variation in individuals as to their tolerance to alcohol and that ''at .4 or .3 you will find 95 per cent of the people drunk; and the five or four per cent of people that are not drunk at that point. . . . At .30 of one per cent they are 96 to 97 per cent of people in, as this chart represents it, dazed and dejected condition. About, I should say about 95 to 96 per cent of the people

respond in that manner. . . . You can't say every one is going to respond in this manner . . . ," the witness was asked on redirect:

"In your experience have you observed the people having a content of .35 of one per cent of alcohol in their blood as being ambulatory, able to walk around?"

Over objection the witness was permitted to testify: "I have records that show over a period of quite a number of cases, that they were ambulatory in that figure. Those are city records."

This answer was stricken out on motion of counsel for appellants on the ground that "the records are the best evidence."

Thereafter objections were sustained to questions by counsel for respondents as to whether in specific instances persons observed by the witness were ambulatory with .35 of one per cent of alcohol in the blood and the court finally said: "I will obviate your objection, I will ask him one question: Q. Mr. Swim, in your opinion, is a person whose blood contains 0.35 of one per cent of ethyl alcohol ambulatory?" Without objection the witness answered: "He is ambulatory in the majority of cases." Afterwards, on further cross-examination, counsel for appellants returned to the subject of specific occasions when the witness had observed persons who were ambulatory with .35 of one per cent of alcohol in the blood and elicited testimony that some were represented by city records and some were persons whom the witness had observed drinking and from the amount of liquor consumed could estimate that there was that quantity of alcohol in the blood; that he had not tested the blood of these persons; that he had given lesser quantities of alcohol to human beings experimentally but not up to the point where there was .35 of one per cent in the blood stream, but that he had performed such experiments on animals.

Appellants first argue that only physicians and surgeons may qualify as experts on physiological questions. This is not the rule. "As a general rule, any practicing or duly qualified physician or surgeon, is competent to state his inference or judgment, but it is not essential that a person testifying on a question of health or physical condition should be a medical practitioner." (32 C.J.S. 262.) "The common law, it may be added, does not require that the expert wit-

ness on a medical subject shall be a person *duly licensed to practice medicine . . .''* (2 Wigmore on Evidence, 3d ed., 667.) The California cases are to the same effect. (*Kimic v. San Jose-Los Gatos etc. Ry. Co.,* 156 Cal. 379, 391-392 [104 P. 986]; *Estate of Toomes,* 54 Cal. 509 [35 Am.Rep. 83].)

It is further argued that the witness was not, in any event, shown to be sufficiently qualified to give an opinion as to the effect of .35 of one per cent of alcohol in the blood. "The qualification of a witness to testify as an expert is a matter within the sound discretion of the trial court, and where there is no showing of a clear abuse of that discretion the ruling of that court will not be disturbed on appeal.

Where the witness has disclosed a sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than to its admissibility.'' (10 Cal. Jur. 963; 2 Wigmore on Evidence, 3d ed., 641; 31 C.J.S. 99-101.)

The evidence shows that the witness is a graduate chemist, a toxicologist, a lecturer on toxicology at the School of Medicine of the University of California, and toxicologist to the coroner of San Francisco; that he has made over 3,500 tests for the alcoholic content of the blood of deceased persons, and that he has had access to the official reports showing the conduct of such persons prior to death; that he has made experiments on animals with alcohol up to .35 of one per cent of alcohol in the blood; that he has made experiments with human beings with alcohol but not as high as that percentage of alcohol in the blood; and that he has observed persons drinking liquor where from their weight and the amount consumed he could estimate quite accurately that .35 of one per cent of alcohol was present in their blood and has observed their conduct under those circumstances. We can find no abuse of discretion in the trial court's ruling permitting the witness to testify as an expert.

Some point is attempted to be made of the witness' testimony as to specific instances of individual conduct under intoxication. Such testimony as was allowed to stay in the record on this subject was all elicited by appellants' counsel on cross-examination of the witness. It may also be observed, as pointed out above, that the first evidence that a person could be ambulatory with .35 of one per cent of alcohol in his blood was also brought out by counsel for appellants.

 On or about May 5, 1942, appellants served and filed a notice of motion to be relieved from their waiver of a jury trial and on June 3, 1942, this motion was denied. Appellants urge that the order denying their motion was an abuse of discretion. On September 16, 1940, appellants had filed a memorandum to set the cause for trial, in which it was stated that "a jury trial is not demanded." Pursuant to this memorandum the cause was set upon the trial calendar for trial without a jury. On December 9, 1940, a similar memorandum to set was filed by appellants again reciting that "a jury trial is not demanded" and the case was again set for trial without a jury. Under section 631, subdivision 4, Code of Civil Procedure, a jury trial is waived if the parties fail to demand a jury at the time the cause is first set for trial. (*Mutual Bldg. & Loan Assn.* v. *Corum,* 220 Cal. 282 [30 P.2d 509, 513] ; *Stern* v. *Hillman,* 115 Cal.App. 156 [300 P. 972].)

 Appellants first argue that the minor plaintiff could not legally waive her right to trial by jury, nor could such waiver be legally made for her by her guardian *ad litem* or attorney. The precise question appears to have arisen in very few cases. It is settled in this state that a guardian *ad litem* cannot prejudice the substantial rights of a minor by any admissions, waivers or stipulations. (*Kidwell* v. *Ketler,* 146 Cal. 12 [79 P. 514] ; *Gackstetter* v. *Market Street Ry. Co.,* 130 Cal.App. 316 [20 P.2d 93].) This rule is not, however, carried to the extent of depriving the guardian *ad litem* or his attorney of the power to bind the minor in the merely procedural steps incident to the conduct of the litigation. In *Western Lumber & M. Co.* v. *Phillips,* 94 Cal. 54 [29 P. 328], the Supreme Court expressly held that a minor acting through his guardian could waive findings. The general rule is thus stated in *Kingsbury* v. *Buckner,* 134 U.S. 650, 680 [10 S.Ct. 638, 33 L.Ed. 1047] :

"It is undoubtedly the rule in Illinois, as elsewhere, that a next friend or guardian *ad litem* cannot, by admissions or stipulations, surrender the rights of the infant. The court, whose duty it is to protect the interests of the infant, should see to it that they are not bargained away by those assuming, or appointed, to represent him. But this rule does not prevent a guardian *ad litem* or *prochein amy* from assenting to such arrangements as will facilitate the determination of the case in which the rights of the infant are involved."

Appellants rely on *Lieserowitz* v. *West Chicago St. R. R. Co.*, 80 Ill.App. 248, which involved a suit in equity to set aside a collusive judgment taken in favor of the minor for a small amount. In that case the court said at page 253:

"Plaintiff, being a minor, could not herself waive a jury and consent to a judgment. *Railroad Co.* v. *Elder*, 50 Ill.App. 276; 2 Pomeroy's Eq. Juris. 815; *Daingerfield* v. *Smith* [83 Va. 81], 1 S.E.Rep. 599.

"Much less could she be bound by any waiver or consent of her next friend."

This case, so far as we can learn, stands alone for the proposition that a minor acting through his guardian or next friend cannot waive a jury trial. Several cases have been called to our attention in which it has been held that a minor can waive a trial by jury in a criminal case (*Mickens* v. *Commonwealth*, 178 Va. 273 [16 S.E.2d 641]; *Lee* v. *State*, 86 Tex.Cr.R. 203 [215 S.W. 856]; *Mince* v. *State*, 86 Tex.Cr.R. 327 [216 S.W. 884]; *Ex parte Gordon*, 89 Tex.Cr.R. 125 [232 S.W. 520]) and in *Wiley* v. *Edmondson*, 43 Okla. 1 [133 P. 38, 41] the Supreme Court of Oklahoma stated: "We think it is clear that the attorney appearing for the minor, who sued by her guardian, is authorized to waive the right to a jury trial."

The weight of *Lieserowitz* v. *West Chicago St. R. R. Co.*, *supra*, as an authority, even in Illinois, is weakened by the fact that the same court in *O'Malley* v. *Marquardt*, 170 Ill. App. 278, 282-283, indicated its opinion that a minor appearing by a next friend could legally waive a jury trial. It is weakened by the further fact that the question actually before the court was as to the power to consent to the entry of a judgment. The language of the court in the Lieserowitz case is in the conjunctive: "Plaintiff, being a minor, could not herself waive a jury *and* consent to a judgment," and the two cases cited in support of this statement involved consent judgments against minors and did not discuss or consider the waiver of a jury trial.

■ The question whether to demand a jury trial or waive one and try the case to the court is one of trial tactics and procedure only, and the waiving of a jury trial does not in any sense affect the substantial rights of a party. ■ If the guardian *ad litem* of a minor has not the legal power to waive a trial by jury it would follow that the trial court must insist on

the calling of a jury in every case in which a minor is a party even though no demand for a jury trial is made and the guardian refuses or fails to deposit the jury fees as expressly required by the code. (Code Civ. Proc., § 631, subds. 5, 6, 7.) We are satisfied that the guardian *ad litem* of a minor has the legal power to waive a jury trial.

The motion to be relieved from the waiver of a jury was supported by the affidavit of appellant, Isabel B. Cloud. The material parts of that affidavit read as follows:

"That when this affiant retained an attorney to prosecute the above entitled action, she did not have any funds to prosecute the same, and her agreement with her attorney did not provide for said attorney to advance any costs of said cause. At the time said Memorandum of Motion to Set was filed, and at the time said case was set for trial, this affiant not only was without funds to pay the costs of a jury, but from her information regarding the previous juries trying personal injury cases in which the Market Street Railway was involved, it seemed to this affiant that the defendant Market Street Railway had too much success with juries.

"That since plaintiff's waiver of a jury trial by failing to announce that a jury was required at the time the cause was first set, this affiant on her own behalf and on behalf of her minor daughter has been able to accumulate sufficient funds to pay for a jury trial, and is now informed that in the interest of justice she should on her own behalf, and on behalf of her minor daughter have the above entitled cause tried by a jury."

On the hearing of the motion appellant, Isabel B. Cloud, testified orally that when the attorney was employed she did have funds to pay the costs of said action but before the case was first set for trial she had lost her money and could not put up the jury fees; and that she had since made a new agreement with her attorney whereby the attorney agreed to advance the costs, including the jury fees.

Section 631 Code of Civil Procedure provides that: "The court may in its discretion, upon such terms as may be just, allow a trial by jury to be had, although there has been a waiver of such trial."

In exercising its discretion the court was entitled to consider with the evidence of lack of funds the averment of appellant's affidavit that at the time the case was set for trial "from her information regarding the previous juries trying personal injury cases in which the Market Street Railway was

involved, it seemed to this affiant that the defendant Market Street Railway had too much success with juries.'' In view of the fact that if plaintiffs were so destitute as to be unable to advance the jury fees they would be entitled to a jury trial upon showing that fact to the court by proceeding *in forma pauperis* (*Martin* v. *Superior Court*, 176 Cal. 289, 298 [168 P. 135, L.R.A. 1918B 313]) and the further fact that they were able to procure a new contract from their attorney in which he agreed to pay the jury fees, the trial judge may reasonably have concluded that the true reason that a jury was originally waived was not lack of funds but solely the affiant's belief that it would be wiser to try the case before the court without a jury. If the court so found, as we must assume in support of its order, the case presented was no different from any other in which a plaintiff after first waiving a jury because he had decided that it was preferable to try his case to a court, afterwards changed his mind and sought relief from his waiver. If the denial of the motion under such circumstances is an abuse of discretion, then every litigant who changed his mind about a jury trial after first waiving one would equally be entitled to be relieved upon a like motion.

The judgment appealed from is affirmed.

Nourse, P. J., and Goodell, J., concurred.

A petition for a rehearing was denied May 22, 1946, and the following opinion then rendered:

THE COURT.—In their petition for rehearing appellants argue that the statement in the opinion that the motorman heard a slight bump at the left front door of the car is not supported by the record. It is true that the motorman did not use the word ''bump'' in his testimony of this incident. His exact language, as it appears in the transcript, is here quoted:

''I heard something like something hit the front gate . . . like something hit the gate; just made a little noise of some kind. Anything that hit that gate, the gate is loose, and anything that touches it causes it to hit the bar there.''

Appellants' petition for a hearing by the Supreme Court was denied June 20, 1946. Carter, J., voted for a hearing.