MARY JEAN HOUGHTON, APPELLEE, v. JAMES RICHARD
HOUGHTON, APPELLANT.

137 N. W. 2d 861

Filed November 12, 1965.   No. 35943.

Schmid, Ford, Snow, Green & Mooney and Robert V. Dwyer, Jr., for appellant.

Schrempp, Lathrop, Rosenthal, Albracht & Bruckner, for appellee.

Heard before WHITE, C. J., CARTER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ., and WESTERMARK, District Judge.

BROWER, J.

Plaintiff and appellee Mary Jean Houghton brought this action on October 10, 1962, for a divorce on the ground of extreme cruelty from the defendant and appellant James Richard Houghton in the district court for Douglas County, Nebraska. The original petition alleged one child, Alice Marie Houghton, was born to this union on May 4, 1961.

After filing the original petition the plaintiff became pregnant and on July 16, 1963, she filed a supplemental petition, alleging that because of defendant's promises the parties had resumed marital relations after the action was begun and were expecting the birth of a second child in the month of October 1963. She again alleged acts of cruelty and sought a divorce, custody of Alice Marie, child support, and alimony.

The defendant thereafter filed an amended answer and cross-petition. It admitted defendant was the father of the first-born child. It alleged that plaintiff enticed the defendant into having sexual relations on February 17, 1963, and on several occasions thereafter but denied having such relations between October 10, 1962, and February 17, 1963. It denied the child the plaintiff alleged to be expecting was the defendant's child. It alleged plaintiff had condoned any alleged acts of cruelty committed against her as a result of enticing him into sexual relations with her. It further alleged the plain-

tiff had committed adultery and was guilty of extreme cruelty. It prayed for a divorce and the custody of the child which was admitted to be his.

The child referred to in the supplemental petition was born October 1, 1963. She was named Sandra Kay and the testimony shows she was fully developed at birth.

After a trial the court found the defendant to be the father of the infant and awarded a decree of absolute divorce to the plaintiff with custody of both minor children in her, subject to visitation rights in the defendant who was ordered to pay $12.50 per week for the support of each child. It gave the plaintiff the household furniture and fixtures and the equity in the real estate of the parties. It further ordered the defendant to pay the professional services of the doctor with the prenatal care and birth of Sandra Kay Houghton, together with attorney's fees of the plaintiff. Defendant's motion for new trial being overruled, defendant has appealed.

The assignments of error, so far as are necessary for our decision, are: The court erred in its finding that the defendant was the father of the infant, Sandra Kay; in ordering the defendant to pay the plaintiff support for her maintenance and to pay the doctor bills in connection with the prenatal care and birth of said infant; in granting custody of the minor child, Alice Marie, to the plaintiff; and in granting the plaintiff an absolute divorce from the defendant, and in not granting the defendant an absolute divorce from the plaintiff on the grounds of adultery and extreme cruelty. The court further erred in not finding that the results of blood tests of the plaintiff, defendant, and the infant, Sandra Kay, were conclusive, and that as a result of the tests the defendant overcame any presumption of legitimacy of said child.

A motion was made previous to the trial by the defendant to require blood tests to be taken of the parties and Sandra Kay for the purpose of determining the parentage of that infant. The motion was never heard

but the parties agreed that the tests would be made and agreed that Dr. Earl Greene would make them.

Medical science has established that such tests may determine in some instances that a certain person cannot be a parent of a certain child although they may not affirmatively prove that one is in fact one of the parents.

The doctor was notified of their agreement by the plaintiff's attorney and the parties appeared pursuant to arrangements on December 17, 1963, at the Bishop Clarkson Memorial Hospital, the plaintiff bringing the infant with her. Blood was drawn from each of the three in the presence of the doctor and the samples labeled in his presence. The blood specimens so labeled were taken to the blood bank where blood typing is normally done. The tests on the three specimens were made by qualified medical technologists in the laboratory at Bishop Clarkson Memorial Hospital under the supervision and direction of Dr. Greene. A separate technologist typed each specimen. On the following day the tests were repeated, each by a technologist other than the one who analyzed the particular specimen the day before. The results were identical and thereafter they were recorded and submitted to Dr. Greene for analysis.

Dr. Greene explained the general procedure for blood typing as follows: "* * * blood is typed by what is called an antigen-antibody reaction. The antigen is the red blood cell and the antibodies are derived from the serum or from the portion of the blood that does not have the red cell. These antibodies and cells are incubated together * * * for a period of time and if the antigen that you are seeking with this particular antibody is present you get a clumping of the cell. This is called the positive reaction and this particular type is present and this particular antigen is present. Q. In other words if the antigen is present then you will get the clumping. If it is not present you will not get any clumping, is that right? A. Yes. Q. If there is a clumping you call it positive and

if there isn't clumping you call it negative? A. Yes, sir."

Tests were made under two systems of each person's blood, one called the Rh system and one the MN system. In this case Dr. Greene made out a report and copies were sent to counsel for each party, one of which was admitted in evidence, showing the results of the tests as reported to him and his interpretation of them which is therein set out. Although he testified at length in regard to these tests and their significance, his conclusion from that report may be understood better than an attempt to here summarize his evidence. They are as follows:

"(1) Rh system. There are 6 antigens in the Rh system. These are usually written, C, D, and E and c, d, and e. All persons have 6 Rh antigens and these occur in three pairs. There is a pair of "C's", a pair of "D's", and a pair of "E's". Each pair may be any combination, i.e., CC, cc, Cc. One of the antigens in each of the pairs comes from the father and one from the mother. In the above case, Mary Jane Houghton has e antigen and no E antigen, and her formula for this particular antigen pair must be ee. James Richard Houghton has e antigen and no E antigen, and his formula for this antigen pair must also be ee. Sandra Kay Houghton has e antigen and E antigen. Her formula for this pair, therefore, would have to be eE. Since neither Mary or James have the E antigen, it must have come from another source.

"(2) In the MN system: The MN system is composed of a pair of anigens which occur in the following combinations: MM, NN, or MN. In the above typing, Mary Jane Houghton is positive for M and positive for N. Her formula is MN. James Richard Houghton is negative for M and positive for N. His formula is NN. Sandra Kay Houghton is positive for M and negative for N. Her formula is, therefore, MM. One of the M's in Sandra Kay's

formula could have been inherited from the mother, Mary Jane Houghton. However, the other M could not have been inherited from James Richard Houghton, since he does not possess this factor. It would, therefore, have to come from another source.

"The above findings would exclude James Richard Houghton as father of the infant, Sandra Kay Houghton."

Irrespective of the weight to be given evidence derived from such blood tests generally, plaintiff contends that the result of the tests and the doctor's conclusions and report therefrom cannot be accepted in the present case. Plaintiff urges she objected to the admission of the doctor's testimony and his conclusions formed therefrom as well as his report because it was without foundation and immaterial because the doctor did not personally perform the tests. The doctor had testified at length as to the procedure regularly followed in making blood tests which he said was followed here. The technologists, he said, were working under his direction. In part he stated: "I might add that as far as supervision or not supervision, this is the blood bank. This is the normal practice for transfusions where the blood is to be given to a patient where incompatible blood if given will cause a reaction, a severe illness, morbidity, even death. These girls do this routinely. The girl in charge of blood banking has been in this blood bank for about five years. This is after her initial training which consists of three years of college, one year of medical technology, four years experience in another hospital, back in our hospital where she has been in the blood bank for five years. * * * The other girls have worked in the blood bank for a period. They are all registered medical technologists except for one but they have been in for periods—I don't believe there is any under one year. This is what they do all year."

Where it is shown that a qualified pathologist made blood grouping tests with the assistance of experienced

technicians, and that the technicians recorded the results of their work which were given to the pathologist for interpretation who thereupon in reliance of such records makes a written report, the report and testimony of the pathologist concerning the tests are admissible in evidence without calling the technicians to give foundation testimony under the provision of section 25-12,115, R. R. S. 1943.

Plaintiff maintains that even if the evidence were admissible, its force in the case before us was destroyed by reason of admissions of the doctor on cross-examination.

The doctor was cross-examined in part by plaintiff's counsel asking questions concerning his procedure in making this paternity test as compared to the methods and precautions suggested by certain eminent authorities in an article appearing in the Journal of the American Medical Association for the year 1952, Vol. 149, page 699. The article was written before and its publication in turn had been previously approved by the Committee on Medicolegal Problems of the association. At its beginning it is stated that great progress had been made in the 15 years since the committee had made a previous report. The following appears near the close: "This committee recommends that this report be distributed to proper medical and legal authorities in order to familiarize them with the facts available concerning the medicolegal application of blood grouping tests. In this way it is hoped that this knowledge will become more generally available and the maximum use be made of the tests in courts of law, in order to substitute scientific facts for opinion." More than 12 years have passed between its publication and the trial of this matter in district court.

Objections based on the contents of this article were made by plaintiff because commercial serums were used. At one point the published article stated: "It is reprehensible to accept a case of disputed paternity and then

purchase the necessary testing serums in order to obtain one's first experience with the delicate M-N and Rh-Hr tests with a problem of this nature." The doctor, on being interrogated on this statement, said that it might be improper in such a case to go right out and buy the serum and use it, but in this instance the antigens used were those available in their laboratory which are kept for blood banking generally although not for paternity testing. He admitted when he cross-matched and typed blood for purposes of transfusion, many times they did not go into the typings employed in making this test. What blood group he types depends on whether it is blood you are going to give, or for a patient with a disease in the Rh or MN groups. The Kell and Duffy groups are ordinarily further investigated only in the presence of atypical antibodies which are not usual, and they are moderately frequent in their blood bank. Many of these patients are referred in because they cannot be cross-matched in a smaller hospital. At the hospital they had previously gone into the MN groups infrequently and he could only think of one instance. The doctor explained that it was not necessary to rely on the label of commercial serums as to potency because its potency is determined by using known antigens and doing a reaction with known antigens to see whether the reaction occurred. He stated that much of that which the authorities in the article were writing about related to previous times when antiserum was actually made in the laboratory and was not commercially available. In 1953 and 1954 much of the commercial antiserum was of variable strength and these were difficulties that had been guarded against since 1958. In the last 2 or 3 years the problems of storage and transportation of serums had been overcome. The doctor, when asked if he had tested the serums, answered: "No. This was handled as the specimens are routinely handled in our laboratory. I made no attempt purposely to mark this out or say this is it. The checks and controls that

are normally done when these people are my agents were normally done." We think from the doctor's testimony the fact that the serums were originally obtained commercially does not detract from the efficiency of the tests where subjected to the safeguards mentioned. Nothing is shown which indicates the serums used were not proper.

The doctor stated that this was the first test made by him for the purpose of determining nonparentage. The plaintiff's attorney cross-examined the doctor relative to a passage from the quoted article which stated: "These tests have numerous pitfalls, and accurate results can be obtained only by specialists with regular and continuous experience with these tests. Moreover, the qualified expert must not only be a capable immunologist but also be well versed in genetics." The doctor stated he agreed generally with this statement but his testimony makes clear that in his opinion the statement in regard to "specialists with regular and continuous experience with these tests," relates to the technicians who perform the tests and not to the pathologist who interprets them. He testified concerning the technologists, saying they were qualified to make the tests and were qualified as immunologists. That is what they are doing. Genetics would refer to the interpretation of the tests and to interpret them day after day is not necessary. However, he stated the girls in the blood bank were well aware of the inheritance of these groups and in general how the blocks are inherited. "Q. And that would be genetics? A. That would be genetics. Q. And they are well-schooled and qualified in genetics? A. Not in the same sense as a geneticist or a physician but I would say that the tests which are done are the listing of the postiive-negatives (sic). The genetics is the last two paragraphs of interpretation."

The doctor himself is licensed to practice medicine in the State of Nebraska and has offices at Bishop Clarkson Memorial Hospital and in the Doctors Building in

Omaha, Nebraska. He holds a Bachelor of Science degree and a Doctor of Medicine degree from the University of Nebraska. He interned at the Charles T. Miller Hospital in St. Paul, Minnesota, and spent his first 2 years of residency in the study of pathologic anatomy and clinical pathology at Bishop Clarkson Memorial Hospital. His third year in clinical pathology was taken at the Indianapolis General Hospital, Indianapolis, Indiana, and his last year of pathologic anatomy was taken in the Armed Forces Institute of Pathology, Washington, D. C. Dr. Greene was certified by the American Board of Pathology in 1958. He has been in the practice of pathology at Bishop Clarkson Memorial Hospital since 1957.

We have reviewed the evidence of the doctor carefully and we think the qualifications of his technicians to make the tests have been adequately shown as have his qualifications to interpret them. Although this is the doctor's first test for nonparentage, other tests of that nature have been made by his partner using the same facilities. The plaintiff introduced no medical testimony to refute them. The doctor who performed the tests was agreed upon by both parties and was not working for either one of them. We conclude there is nothing in the record which would indicate any defect in the testing methods, and his testimony and conclusions remain unshaken.

Having determined that no defect in the testing methods appears from the evidence concerning the blood tests in the case before us, the next question presented is what consideration and weight should be given to the results disclosed by them. Various statutes have been passed providing for blood tests in cases where paternity is an issue. Plaintiff contends that in the absence of a statute specifically authorizing such blood tests this court should not consider them in the present case at all. The Supreme Court of New Hampshire, in Groulx v. Groulx, 98 N. H. 481, 103 A. 2d 188, 46 A. L. R. 2d 994, a case

which had been decided in the trial court before the passage in that state of such a statute, held that judicial recognition should be accorded the accuracy and reliability of blood grouping tests to disprove paternity. See, also, State v. Damm, 62 S. D. 123, 252 N. W. 7, 104 A. L. R. 430, and particularly the same on rehearing, 64 S. D. 309, 266 N. W. 667, 104 A. L. R. 441, where the court corrected and clarified its original holding of 3 years before, stating: "We therefore say, without further elaboration or discussion, that it is our considered opinion that the reliability of the blood test is definitely, and indeed unanimously, established as a matter of expert scientific opinion entertained by authorities in the field, and we think the time has undoubtedly arrived when the results of such tests, made by competent persons and properly offered in evidence, should be deemed admissible in a court of justice whenever paternity is in issue." Many authorities are thereafter cited. We hold this court should likewise take judicial notice of the scientific accuracy and reliability of such tests.

In cases arising either under such statutes or by courts which have taken judicial notice of the reliability of such tests, the courts are not in harmony as to the weight to be given to such evidence. A review of the cases upon this question is contained in an Annotation in 46 A. L. R. 2d, at page 1000. Some cases have held that blood tests indicating nonpaternity are only entitled to the same weight as other evidence. Among them are Arais v. Kalensnikoff, 10 Cal. 2d 428, 74 P. 2d 1043, 115 A. L. R. 163; Berry v. Chaplin, 74 Cal. App. 2d 652, 169 P. 2d 442; and Ross v. Marx, 24 N. J. Super. 25, 93 A. 2d 597. The reasoning of the courts holding this view is stated in Arais v. Kalensnikoff, *supra,* as follows: "Expert testimony 'is to be given the weight to which it appears in each case to be justly entitled.' * * * 'when there is a conflict between scientific testimony and testimony as to facts, the jury or trial court must determine the relative weight of the evidence.'" This is the view

taken by the trial court in the case before us. It admitted into evidence the results of the test but apparently concluded thereafter that the time-honored presumption of legitimacy of a child born in wedlock overweighed the evidence of nonpaternity disclosed by the tests.

The courts of other jurisdictions, while holding the results obtained from tests are not conclusive on the issue of nonpaternity, do hold that such tests should be given great weight. See, Commonwealth v. Gromo, 190 Pa. Super. 519, 154 A. 2d 417; State ex rel. Steiger v. Gray, 3 Ohio Op. 2d 394, 145 N. E. 2d 162; Beck v. Beck, 153 Colo. 90, 384 P. 2d 731. The last-mentioned case relates to the legitimacy of a child, the court holding the results of the blood test were sufficient to overcome the presumption of legitimacy. The other cases dealt with the paternity of children born out of wedlock.

The defendant contends a third rule followed by some courts is the correct one and should be adopted by this court. It is that, in the absence of evidence of a defect in the testing methods, blood grouping tests are conclusive on the issue of nonpaternity. See, Anonymous v. Anonymous, 1 App. Div. 2d 312, 150 N. Y. S. 2d 344; Saks v. Saks, 189 Misc. 667, 71 N. Y. S. 2d 797; Jordan v. Davis, 143 Me. 185, 57 A. 2d 209; Commonwealth v. D'Avella, 339 Mass. 642, 162 N. E. 2d 19; Commonwealth v. Coyle, 190 Pa. Super. 509, 154 A. 2d 412; Retzer v. Retzer (App. D. C.), 161 A. 2d 469.

The case of Anonymous v. Anonymous, *supra,* was an action for separation brought by the wife as plaintiff based on abandonment, nonsupport, and cruelty. Defendant husband filed a counterclaim for divorce alleging the plaintiff had been living in an adulterous relation with another. He admitted the paternity of the oldest child and denied he was the father of the younger twins. He applied for a blood grouping test of himself, the plaintiff, and the twins. The application was denied. The appellate court modified the judgment of the trial court and ordered the tests to be made. In its opinion

the court discussed the question of the weight to be given to such evidence on the new trial, saying: "It is urged that the presumption of legitimacy resulting from the fact that plaintiff and defendant lived together during the period of gestation requires a denial of the motion.

"Reason and logic, as well as a recognition of the modern advances in science, compel a determination that the presumption of legitimacy is not conclusive but rebuttable. The probative value of the results of skillfully conducted blood grouping tests has been widely accepted. The tests of course will be relevant only if they show noncompatibility as between the blood of defendant, the plaintiff, and the twins. If so, such evidence should be deemed conclusive as to nonpaternity." It further stated: "There is no doubt that with the passing of years and the advance of science the age-old concept has gradually given way to the sway of reason, and that the presumption of legitimacy has been withering and shrinking in the face of scientific advances. (Hynes v. McDermott, 91 N. Y. 451, 459; Matter of Matthews, 153 N. Y. 443; Matter of Findlay, *supra.*) Presumptions are looked upon ' "* * * as the bats of the law, flitting in the twilight but disappearing in the sunshine of actual facts." ' (Mockowik v. Kansas City, St. Joseph & Council Bluffs R. R. Co., 196 Mo. 550, 571.) It cannot be gainsaid that we have now reached the point where presumptions must yield to modern scientific facts." We agree with the reasoning in the cited case and hold that in the case before us the results of the tests conclusively determine that the defendant is not the father of Sandra Kay.

Our conclusion with respect to the tests renders it unnecessary to consider on the issue of paternity the evidence offered by the plaintiff tending to show marital relations existed between the parties during the period in which this apparently fully developed child would have been naturally conceived, nor the testimony on behalf of

defendant tending to refute it. Neither is it necessary on the paternity issue to consider the testimony on behalf of the defendant tending to show the presence of another man during late hours in that period at the home of the plaintiff while the parties were living separately. It is, however, of some significance on the issue of the custody of the older child, hereafter to be considered. The results of the tests lend great weight to the latter testimony. In any event, it follows that the results of the tests and our determination concerning them establish that the plaintiff has committed adultery.

In Baker v. Baker, 166 Neb. 306, 89 N. W. 2d 35, this court laid down the following rules in a case where adultery of the wife has been established: "Where the evidence in a divorce action establishes adultery on the part of one of the parties thereto, the court is required to grant the prayer of the other party seeking a divorce on that ground unless prevented from doing so by applicable statutory provisions.

"Where a wife is found to be guilty of adultery she is ordinarily an unfit person to have the care and custody of her minor children as against the husband she has wronged.

"Where adultery by a wife is established, she is not entitled to an award of alimony and ordinarily will not be allowed an attorney's fee or an award of costs."

In the present case it is unnecessary to review the decisions of this court to determine whether or not cruelty committed by the husband is sufficient to permit us to refuse him a divorce under section 42-304, R. R. S. 1943, where the wife has committed adultery. The testimony is compelling that the defendant at various times committed acts of violence amounting to extreme cruelty on the plaintiff both prior to, at, and shortly after the time of the separation. This evidence is adequately corroborated. The defendant in fact admits such actions in certain instances although he attempts to justify his conduct because of the aggravating conduct

of the plaintiff which included acts of violence on her part in some instances also corroborated. We think such cruelty in the past was condoned by the plaintiff who resumed marital relations thereafter. In Wright v. Wright, 153 Neb. 18, 43 N. W. 2d 424, this court stated: "Condonation is forgiveness, express or implied, for a breach of marital duty, with the implied condition that the offense shall not be repeated. Forgiveness sufficient for condonation is complete if there is a voluntary resumption of the marital relations." On the other hand, "Condonation is forgiveness for the past upon condition that the wrongs shall not be repeated. It is dependent upon future good conduct, and a repetition of the offense revives the wrong condoned." Workman v. Workman, 164 Neb. 642, 83 N. W. 2d 368. The record indicates no acts of violence by the defendant after the resumption of marital relations. Defendant discontinued such relations on discovering the plaintiff to be pregnant. The plaintiff's amended petition itself alleges: "That the plaintiff believing the promises of the defendant that he would refrain from repetition of the acts of cruelty complained of in her earlier Petition and that he would treat the plaintiff as a true wife, did resume the marital relationship shortly thereafter." The plaintiff doubtless claims the defendant's subsequent assertion of plaintiff's infidelity to be a renewal of his cruelty, permitting her to reassert his previous actions. The results of the blood tests establish the defendant's assertions to have been justified.

With respect to the issue of child custody, however, it is to be noted that the defendant's acts of violence were at times committed in the presence of his child, Alice Marie. There is evidence, to some extent corroborated, that he struck the child of plaintiff by a former marriage although defendant explained she was hurt on striking the doorjamb while flinching. The testimony indicates he became intoxicated at which times he was quarrelsome. Defendant manifested little concern for the every-

day needs of his child. Immediately after the separation he had rented an apartment for $100 per month, purchased a new car, and committed himself for furniture for $750 which he later returned to the seller. While living with his parents in 1963 he earned over $3,000 as an insurance salesman. He bought a new car at that time but contributed little to his daughter's support. We find the defendant unsuitable to have the custody of his daughter, Alice Marie.

In Beck v. Beck, 175 Neb. 108, 120 N. W. 2d 585, a case involving the wife's adultery, it is stated: "Where in an action for divorce both parents are found to be unfit or unsuitable to have the care and legal custody of the minor children of the parties, the welfare and best interest of the children will constitute the sole consideration in determining the right of custody.

"Under the provisions of section 43-236, R. R. S. 1943, where the parents of minor children are unfit or unsuitable to have their custody, the separate juvenile court may properly place their legal custody in the chief juvenile probation officer on such terms and conditions as the court may prescribe.

"Where adultery by a wife is established in an action for divorce, she is not entitled to an award of alimony and ordinarily will not be allowed an attorney's fee to be paid by the husband." In the Beck case the legal custody of the minor chillren was placed in the chief juvenile probation officer of Lancaster County, Nebraska. In the present case a like officer exists in Douglas County. It is uncontroverted that the plaintiff is an immaculate housekeeper. The children were neat and clean. The child of both parties is of the tender age of 5 years. Babysitters have been provided for while the mother was at work. Neither child has been neglected. Moreover, it is quite desirable that the half-sisters should not be separated. We conclude that the custody should be resolved as it was in the Beck case.

The trial court ordered the defendant to pay $12.50

a week for each of the two children determined by it to be the defendant's children. The defendant is a salesman of insurance. He has been occupied in that capacity since March 1, 1962. His company permits him during the first years of his employment to draw more than he earns, the excess to be deducted from future earnings when he becomes a more proficient salesman. In 1963 he drew from his company $5,100, but appears to have earned $3,900, subject to deduction not only of withholding and social security but for certain advertising expenses chargeable to him. It is admitted his employment is expected to be more profitable although he presently owes his employer more than $4,000 for advanced withdrawals. We think he should pay $25 a week for the support of Alice Marie.

The judgment of the trial court should be reversed. It is directed to enter a decree of divorce in favor of the defendant on his cross-petition for the adultery committed by the plaintiff and to find the defendant is not the father of the child, Sandra Kay. It should provide that the defendant pay the costs of the blood tests, the other costs to be taxed to the plaintiff. The expenses occurring on the birth of the minor, Sandra Kay, and attorney's fees to plaintiff are to be disallowed.

The legal custody of the minor child, Alice Marie Houghton, is placed in the chief juvenile probation officer of Douglas County with instructions to leave the physical custody with her mother, Mary Jean Houghton, under the supervision of such probation officer, during the time she shall properly care for her, and under an environment not inimical to the child's best interests. If the mother fails in her obligation to act in accordance with the child's best interests and welfare, such failure is to be called to the attention of the court for further disposition as it shall deem necessary. The defendant is to pay $25 a week for the support of Alice Marie with the right of visitation at reasonable times on Sundays.

No contention is made with respect to the division

of the property made by the trial court and no change need be made. The temporary orders for support made by the trial court should be paid by the defendant but no further support should be awarded the plaintiff.

The judgment of the trial court is reversed and the cause remanded with directions to enter a decree of divorce in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

WHITE, C. J., and BOSLAUGH, J., dissenting.

We respectfully dissent from that part of the majority opinion which holds that the results of blood tests in cases such as this conclusively determine the issue of paternity.

WESTERMARK, District Judge, dissenting.

The child, Sandra Kay Houghton, involved in this action was born during wedlock. She is presumed to be the child of the defendant in this case unless the presumption is overcome by clear and convincing evidence. Nebraska recognizes this presumption of parentage. Zutavern v. Zutavern, 155 Neb. 395, 52 N. W. 2d 254. As recently as in 1963, Volume 10 Am. Jur. 2d was published. Under the title of "Bastards" section 11, page 852, we find the following rule: "While the former arbitrary rule has been relaxed so that the presumption of legitimacy of a child begotten or born in wedlock is now rebuttable by practical methods and substantial evidence, it remains one of the strongest rebuttable presumptions known to the law, and the interests of society require that it be given effect unless overcome by the strongest sort of evidence, in the absence of which the presumption remains conclusive."

The opinion adopted by the court holds that the findings of the pathologist, who conducted the blood tests that were made as shown by the opinion, were conclusive and by reason thereof were sufficient to overcome the presumption of legitimacy. In my opinion the evidence relating to the blood tests does not support such a conclusion nor does it support the conclusion that the

presumption of legitimacy has been overcome by the strongest sort of evidence.

The courts seem to agree that before blood tests may be considered in determining nonpaternity the accuracy of the testing methods must be established. See 46 A. L. R. 2d 1005. In Beach v. Beach, 72 App. D. C. 318, 114 F. 2d 479, 131 A. L. R. 804, which was decided in construing a statute, the appellant alleged pregnancy caused by the defendant, which he denied. A child was born pending suit and the district judge, on motion of the defendant, ordered that the mother and child submit to blood grouping tests to compare with the blood of the defendant. The court said: "The value of blood grouping tests as proof of non-paternity is well known. On this point it is enough to cite the report of the American Medical Association's Committee on Medicolegal Blood Grouping Tests, which shows that although such tests cannot prove paternity, and cannot always disprove it, they can disprove it conclusively in a great many cases provided they are administered by *specially qualified experts.*" (Emphasis supplied.) In 46 A. L. R. 2d 1005, we find the following statement: "As to the weight to which evidence consisting of blood grouping test results is entitled, the courts are divided. Some, but not all, have ruled that such results are conclusive on the question of paternity where they show nonpaternity and *where the accuracy of the testing methods is established.*" (Emphasis supplied.)

In this case, the pathologist who supervised the tests admitted on cross-examination that one Doctor Philip Levine, who first discovered Rh antigen, in 1946 had written an article in the Journal of American Medicine headed, "Medico-Legal Application of Blood Grouping Tests"; and agreed with his statement in the article, "These tests have numerous pitfalls and accurate results can be obtained only by specialists with regular and continuous experience with these tests." He further admitted that these tests were the first blood grouping

tests to determine nonpaternity that he had supervised. By these admissions we have no assurance that the tests conducted under his supervision carry the weight which are conclusive and which are sufficient to overcome the presumption of legitimacy.

. The importance of blood grouping tests and the necessity of obtaining accurate reports by competent experts has been a matter of consideration by the National Conference of Commissioners on Uniform State Laws. It may be noted that in 1952 the National Conference of Commissioners on Uniform State Laws approved the Uniform Act on Blood Tests to Determine Paternity. The uniform act has been adopted in California, Michigan, New Hampshire, and in Oregon, and possibly some other states. The purpose of the act is to provide certain procedures relative to blood tests before the findings of the experts may be considered conclusive.

In my opinion the matter of determining paternity or nonpaternity of children born in wedlock is of such importance that the tests should not be considered conclusive unless it is so provided by legislative enactment. · ·We all recognize the advances made in medical science. The procedures and tests performed as a result of the advances in the medical field are entitled to every consideration. The courts recognize and accept the new procedures. Yet the duty of preserving the home and protecting children born during the marriage relationship from the stigma of illegitimacy is one of the most important responsibilities of society and the courts. To meet this responsibility the courts have adopted the rules relating to the presumption of legitimacy. These rules must not be changed or modified by new medical procedures and tests unless such tests are shown to have been accurately made; or unless the Legislature has enacted appropriate statutes relative to such tests.

. From a strict legal standpoint, it may be said that there was condonation on the part of the plaintiff which would deny her the right of divorce. Technically, she should

have dismissed her action for divorce after the alleged condonation and filed a new action alleging nonsupport to conform to the facts in this case. However, the facts in this case certainly indicated that the only solution to the problems is a decree of divorce. The husband by his acts of cruelty commenced the series of incidents which led to the problems of these parties. The trial court no doubt considered all of the circumstances in this light in granting the divorce to the plaintiff.

Further, I do not agree with the provision in the judgment of the court which provides that legal custody of the minor child, Alice Marie Houghton, be placed in the chief juvenile probation officer of Douglas County with instructions to leave the physical custody with her mother. No doubt this requirement was to provide a proper moral atmosphere for the child. This of course is important. But it should not be the sole consideration. In too many cases the courts overlook the fact that minor children are not chattels. They are personalities with definite and various needs and should be treated as such. One of the common legal expressions in divorce actions is that one or the other parent is "entitled to custody" overlooking the most important matter which is, what are the minor children entitled to.

The record in this case shows that the mother did not neglect the child, Alice Marie Houghton. Because the husband failed to provide support, the mother was employed steadily, except for a short time before Sandra Kay was born; but she provided for the material and physical needs of the children, kept a neat home, and kept the children clean. The child, Alice Marie, depended upon the mother for all her physical needs. From the record we can infer that the only feeling of security and love and affection she got was given by the mother. There is no showing that she will not continue to provide these vital needs of the child. The record shows that no other person was prepared to or would provide the child with the material necessities of life, and also

what is so important to a child, a feeling of security, love, and affection. Certainly a probation officer cannot provide these important requirements.

This court has said in several cases that the custody and care of minor children is to be determined by what will be for the welfare and best interests of the child. This of course should include future welfare as near as it can be reasonably foreseen.

To me it is rather difficult to distinguish between legal custody and physical custody as applied to this case. In a sense it is a split custody. Applying it to all the problems of caring for children, including discipline, it suggests many situations wherein a reasonable and honest misunderstanding may arise. These situations will have the tendency of creating in the child a feeling of uncertainty and insecurity. It may haunt her until she reaches the age of maturity. For instance, if she should desire to get married upon reaching marriageable age, before attaining the age of 21 years, she must obtain the consent for marriage under the provisions of section 42-105, R. R. S. 1943. Under the provisions of the decree, the mother cannot sign the consent because she does not have legal custody and the probation officer cannot sign the consent because he does not have the actual custody. For these reasons I conclude that the provisions as to custody of Alice Marie Houghton are not for the welfare and best interests of the child.

Certainly, we are interested in the moral atmosphere for the child. This need could be assured by providing that the home be visited by the probation officer, who may be directed to report to the district court having jurisdiction of this case and the minor child any failure of the plaintiff in meeting the responsibilities of caring for the child or failing to rear the child in a proper moral atmosphere.

In my opinion the trial court was correct in determining that the plaintiff was entitled to a divorce and in

awarding custody of the minor children to the plaintiff, and I would affirm the lower court's findings and decree.