[Civ. No. 2560. Third Appellate District.—April 9, 1923.]

In the Matter of the Guardianship of the Person and Estate of LOUIS E. PRICE et al., Minors. JOHN L. PRICE, as Guardian, Appellant, v. STANLEY MURRAY, Respondent.

[1] ATTORNEY'S FEES—SERVICES FOR MINORS—EMPLOYMENT BY GUARDIAN AD LITEM—INSUFFICIENCY OF EVIDENCE.—In this proceeding on an application for an allowance for legal services performed for the estate of certain minors before the appointment of a general guardian, there was no substantial evidence to support the finding that the attorneys were employed by the guardian *ad litem,* who was himself an attorney and well qualified in point of learning to fully represent such minors in the litigation.

[2] ID.—IMPLIED PROMISE OF PAYMENT FOR SERVICES—EVIDENCE—INAPPLICABILITY OF DOCTRINE.—The doctrine that when services are rendered to another with his consent and acquiescence without an understanding that they are to be rendered gratuitously, a promise to pay therefor is implied, has no application to the employment of attorneys by the mother of minors to defend their interests in litigation in which a guardian *ad litem* has been appointed, and the evidence shows without conflict that, so far as the estate of the minors was concerned, the understanding was that the services were to be rendered gratuitously.

[3] ID.—EMPLOYMENT OF ATTORNEYS BY MOTHER OF MINORS—LIABILITY OF ESTATE—WANT OF AUTHORITY.—In view of section 372 of the Code of Civil Procedure, which provides that an infant must appear in an action either by his general guardian or by a guardian *ad litem* appointed by the court in which the action is pending, the mother of minors is without authority to make their estate liable for the payment of fees of attorneys employed by her .to represent the estate in pending litigation.

[4] ID.—LEGAL COMPETENCY OF GUARDIAN AD LITEM—EMPLOYMENT OF ADDITIONAL COUNSEL.—Where a guardian *ad litem* is an eminent attorney and capable of attending to the litigation, the estate of the minors can only be charged with the cost of additional attorney's fees upon a showing that the employment was reasonable and necessary.

[5] GUARDIAN AND WARD — EMPLOYMENT OF ATTORNEY — ORDER OF COURT.—Before employing an attorney, if a guardian expects to charge the estate with the cost, he must obtain an order of the court permitting such expense.

APPEAL from an order of the Superior Court of Madera County allowing compensation for legal services out of the estate of minors. C. E. Beaumont, Judge Presiding. Reversed.

The facts are stated in the opinion of the court.

Henry C. McPike for Appellant.

Mason A. Bailey and W. C. Ring, Jr., for Respondent.

BURNETT, J.—John L. Price having been appointed general guardian of the person and estate of said minors, respondent made an application to the court in said guardianship matter for an allowance of three thousand dollars for services performed for said minors before the appointment of said general guardian in an action brought in the superior court to quiet title to certain real estate in the county of Madera. The application was opposed by said general guardian and, after a full hearing, the court made an order that "Stanley Murray, Esq., and W. C. Ring, Esq., do have and recover of and from J. L. Price, general guardian of Louis E. Price and Harold C. Price, minors, the sum of seven hundred and fifty (750) dollars," from which order the appeal has been taken by the general guardian. From the findings of the court we glean the following:

"III. That on or about the 7th day of September, 1919, Bessie Price, the mother of said defendants, and the person having the sole custody of them employed said firm of Murray and Ring to appear in behalf of said defendants in said action as their attorneys; that the amount of compensation for their services was not agreed upon or determined at that time, but it was then and there understood and agreed between said attorneys and said Bessie Price that said attorneys would be compensated for their services from the estate of said minors.

"IV. That thereafter, and on or about the 13th day of September, 1919, said M. B. Harris, guardian *ad litem* of said defendants, authorized said Murray and Ring to appear in his behalf as such guardian *ad litem* in said action and in behalf of said defendants, and it was then and there understood and agreed by and between said guardian *ad litem*

61 Cal. App.—38

and said attorneys that they would be compensated for their service from the estate of said minors.''

Said attorneys performed practically all the work in behalf of said minors that said action entailed and were successful in their efforts.

"Said minor defendants were financially unable to and did not meet any of the necessary expenditures and disbursements in said action, and said attorneys made all of such expenditures and disbursements necessary . therefor. . . . That at the time said Bessie Price requested said Stanley Murray and W. C. Ring Jr. to represent said defendants in said action, Stanley Murray knew that a guardian *ad litem*, to wit, M. B. Harris, had been appointed by order of the said superior court to represent said minors, and that said M. B. Harris was an attorney of the court appointing him, and was well qualified in point of learning to fully represent said minors in the said action.''

We have sought in vain in the record to find any substantial evidence to support the finding that said attorneys were employed by the guardian *ad litem* to represent the minors in the litigation. M. B. Harris testified directly to the contrary and his testimony was not contradicted in any respect.

As to what occurred when Mr. Ring consulted with him, in answer to questions by Mr. Ring he testified as follows:

"Mr. Harris, do you recall when I came down to Fresno with the answer and cross-complaint that were first filed in the case and showed them to you, and I don't know whether you remember that particularly or not, but I will refresh your memory with it. A. Well, I wouldn't want to be positive, Mr. Ring. I remember your coming there with an answer, pleading in the matter. Q. Do you recall that I came down there one afternoon about the fifteenth or sixteenth day of September, 1919, and told you that I was W. C. Ring, Jr.? I don't think we had ever met before and Mr. Murray and I had been retained by Mrs. Bessie Price to represent the children in the case and we had prepared an answer and cross-complaint to be filed and asked you if you would verify it as guardian *ad litem*? A. I remember something of that kind, yes. Q. Do you remember saying at that time, 'Well, I am very busy and it is growing late in the afternoon,'—I think it was perhaps 4 or 4:30

then, 'and I won't have time to look it over to-day but if you will leave it I will look it over and if it is all right I will verify it and send it to the court or send it back to you.' Do you remember some such conversation as that? A. I think that probably happened if you remember it. I don't recollect it exactly that way but I know you brought papers for me to verify. Q. Well, I said, 'Mr. Harris, the time will be up to-morrow, or very shortly, and it will be necessary for this to be filed, if it is going to be filed in time, right away, and if you haven't time to give it attention now, we can verify it, either Mr. Murray or I, since you are out of the county where the action is pending anyhow'? A. I recall the fact that you were willing to have the verification made here. I recall that. Q. And do you remember of making any objection to that at that time? A. No, I didn't object to it. Q. In fact, Mr. Harris, the only point that you wanted clear between Mr. Murray and myself during the whole course of the proceedings, was that you, personally, were not going to be liable for any attorneys' fees for the work? A. Mr. Ring, I wouldn't put it that way, and in fact, I didn't put it that way in my correspondence. I felt I had no right to encumber the estate with an obligation that I had been appointed to perform and I undertook to make that clear. Mr. Ring: Q. In any way that it would be an assistance to us as attorneys in the case, you were willing for us to sign our names as guardian *ad litem* too? A. I think I stated it to you and in a letter, so as to be absolutely certain that while I was glad that you should act, yet it must be with your knowledge it wasn't by my employment, and further, where assistance was offered to the minors, I had no right to refuse it, but it wasn't by my employment as guardian of the estate or otherwise.''

There was also some correspondence between Mr. Ring and Senator Harris, of which we may refer to the concluding part of a letter written by the former to the latter on October 21st, as follows:

''However, we do not care to stand on the fence between your failure to actually and irrevocably either consent or refuse to consent to our further participation in the case.

''We would therefore thank you to come out and say one way or the other your desires in the matter, although, of

course we understand that you consented to our going ahead. We do not expect to look to you for any compensation for our services, but do feel that we should know exactly where we are in the matter in your regard.''

Two days later Mr. Harris replied as follows:

''The letter to which you refer as not having been answered by me was received. There did not seem to be any occasion for a reply. I had already stated to you fully my position in the matter. *I had not employed you* and feel fully competent personally to take care of the interests of my wards. You had been employed by the mother of my wards and under that employment had obtained my consent to appear for me. A controversy having arisen between you and your employer, you desired me to give you authority to continue in this case. I did not feel that I could be a party to the controversy and told you that *you had my permission to continue to act as attorneys of record for me, but that I had not employed you,* and would not be responsible for you in any way for your fees. That if you chose to continue in the case with that understanding, it was satisfactory to me that you should do so.

''I do not know how I could have made my position any plainer, and I do not know how I could consistently take any other position. It is my duty to protect my wards, and I have no right to refuse any assistance that may be offered.''

Mr. Harris testified further:

''The letters state pretty thoroughly the transactions between Murray & Ring and myself as guardian *ad litem.* In addition to the letters there were one or two conversations with Mr. Ring. I don't recollect ever having any conversation with Judge Murray but with Mr. Ring I made it quite clear as far as I was personally concerned I was ready to take care of the case for the minors as their guardian, but in view of the fact that the firm had been employed by the mother who wished a defense made by them also for the minors, that I would only consent and willingly consent that they should take part in the proceedings as they saw fit for the protection of the minors, but they must understand it was not at my employment or the employment of the estate but at the employment of the mother. That conversation, I am quite clear, took place once and possibly

oftener, and I made the same statement in open court at one time before the court.''

It is not claimed that the witness was not entitled to full credit. Assuredly, there is nothing inherently improbable in his testimony, nor is there a single circumstance revealed that would discredit it in the least. Moreover, the witness is a man of superior attainments and he expressed himself so clearly that there can hardly be any room for misunderstanding as to his meaning. We may remark that a significant and corroborative circumstance is found in the fact that Mr. Ring did not take the stand to contradict the statements of the witness. If his recollection of the interview had been different, he would, of course, have felt constrained to so inform the court.

[1] As we read and construe the record we can reach only the conclusion that said finding is entirely unsupported. If we concede, therefore, that the guardian *ad litem* had authority to employ other attorneys to represent the minors in the litigation and thereby to bind their estate for the value of such services, we can find in the evidence no sufficient basis for this theory.

[2] We do not overlook the contention of respondent "that the mother of the minors employed him to defend her children's interests and the guardian *ad litem* authorized the appearance and the performance of the services under circumstances from which law and equity imply a promise and obligation to pay. Because, when services are rendered to another with his consent and acquiescence without an understanding that they were to be rendered gratuitously, a promise to pay therefor is implied. (*Lacy Mfg. Co.* v. *Los Angeles Gas Co.*, 12 Cal. App. 37 [106 Pac. 413]; *Batcheller* v. *Whittier*, 12 Cal. App. 262 [107 Pac. 141]; 40 Cyc., pp. 2808, 2809.)'' But the doctrine has no application for the reason, already stated, that the evidence shows without conflict that there was an *understanding* that, as far as the estate of the minors is concerned, the services were to be rendered *gratuitously*.

The question remains whether the other finding as to the employment by the mother is a sufficient support for the judgment.

As to the fact of employment Judge Murray testified:

"Bessie Price came to me and said 'suit has been brought by the Prices against—filed in this court' and she was rather indignant on the ground that she had not been, they had not asked her to become the guardian, and seemed to be a family feeling there, and she said 'that inasmuch as we had been schoolmates and she had known me all my life that she wanted to intrust her case to my care' and I thereupon took the papers up to my office and she at that time cautioned me, she said she was in fear of Mr. Price and didn't want him to know what she was doing, so I took the papers up to the office and consulted my associate at that time, Mr. Will C. Ring, and after going into the matter we proceeded to defend the action."

The witness further testified that thereafter she told him that "Mr. Price had been after her so strenuously to drop the suit and making threats she decided it might be better to drop it and send the bill, and I sent her a bill, and upon receipt of it she came back to the office and she said in view of his actions she wanted us to continue with the case and under no circumstances to drop it, that she wished me to continue with the case and protect the interests of her two children."

[3] From the foregoing it may be doubted whether the court could rationally conclude that the parties agreed or understood that the estate of the minors was to be charged with the value of said services, but be that as it may, the mother had no authority by such contract to make said estate liable. She was not the agent of the minors in reference to said litigation. The sole power to represent the minors was committed into the hands of the guardian *ad litem*. Section 372 of the Code of Civil Procedure provides that the infant "must appear either by his general guardian or by a guardian *ad litem* appointed by the court in which the action is pending."

Even if there be a general guardian the court may, if deemed advisable, appoint a guardian *ad litem* "to represent the infant in the action or proceeding." Herein there was no general guardian, and there is no possible basis for the claim that the one appointed by the court for that very purpose under the sections of the code was not clothed with exclusive power to direct, manage and control the suit in behalf of said minors. He would be subject to the super-

visory authority of the court, but subject to that limitation he is the sole representative of the minors, and no one can divide or diminish his prerogative. In 22 Cyc. 661, it is said: "His powers are strictly limited to matters connected with the suit in which he is appointed, and his acts with respect to the infant's rights concerning any other matters are unauthorized; but he is a full representative of the rights and interests of the infant for the particular case in which he is appointed, and is clothed with as full and perfect authority for that suit as the general guardian is for all the duties incident to his office."

On the following page the statement is: "The duty of a guardian *ad litem* or next friend is to look after the infant's interest and to act for him in all matters relating to the suit as he might act for himself if he were of capacity to do so."

In other words, the authority of the guardian *ad litem* in relation to the suit is equal to what would be the authority of the ward if he were an adult. Manifestly this would be inconsistent with the authority of any other person to employ counsel for the minor in such litigation.

In *Cole* v. *Superior Court*, 63 Cal. 86 [49 Am. Rep. 78], it is declared: "The court is, in effect, the guardian—the person named as guardian *ad litem* being but the agent to whom the court, in appointing him (thus exercising the power of the sovereign state as *parens patriae*) has delegated the execution of the trust, and through such agent the court performs its duty of protecting the rights of the infant or incompetent person."

In *Emeric* v. *Alvarado*, 64 Cal., on page 593 [2 Pac. 459], we find this: "There is no change of parties by the appointment of the guardian *ad litem*. The guardian does not become a party. The infant is the party, and he only appears by the guardian. The latter is appointed to appear for the infant, and to manage and take care of the suit for such infant when he is plaintiff and to appear, manage, and take care of the defense for the infant when he is defendant. In case of an infant defendant, the answer is put in by the guardian for the infant. The guardian has authority to appoint an attorney to put in such answer, but the attorney so appointed is the attorney of the guardian and not of the infant."

[4] But herein the guardian *ad litem* was and is an eminent attorney, capable of attending to the litigation and the evidence shows that there was no need for assistance. Under such circumstances, even if the employment had been made by the guardian, the court would not have been justified in charging the estate of the minors with the additional cost. The guardian could not thus shift to other persons the responsibility imposed upon him personally by his appointment. At any rate, if he employed an attorney he would be primarily liable and if he paid for the services it could be allowed against the estate of his ward only in case the evidence showed the expenditure to be reasonable and necessary. (*Hunt* v. *Maldonado*, 89 Cal. 636 [27 Pac. 56]; *McKee* v. *Hunt*, 142 Cal. 526 [77 Pac. 1103].) [5] Indeed, the rule in this state seems to be that before employing an attorney, if he expects to charge the estate with the cost, he must obtain an order of the court permitting such expense. In *Morse* v. *Hinckley*, 124 Cal. 154 [56 Pac. 896], it is said: "If a guardian cannot enter into a valid contract without first obtaining an order of the probate court, for repairs and improvements of buildings on property belonging to the ward, surely a guardian without such authority cannot enter into a contract for the employment of legal services so as to bind the ward, or in any way affect his property."

In support of the allowance of the claim by reason of the employment by the mother respondent asserts: "Courts of chancery from the beginning have been clothed with jurisdiction over infants and their estates to enforce and secure their protection, maintenance and education. For this purpose and to this end all reasonable and proper expenditures may be made from the minor's estate. This is always true when the minor's father is dead and it is in the custody of its mother 'without reference to her own ability to support and educate them, and such allowance may be made not only to provide for the future, but also to reimburse her for past expenditures.' "

Many authorities are cited to vindicate the foregoing statement, among them *In re Beisel*, 110 Cal. 267 [40 Pac. 961, 42 Pac. 819], and no fault can be found with this general view of the relation of the parents to their children,

but it has no application to this particular case, which is controlled by the express provisions of the statute.

The equitable principle thus invoked by respondent is indeed aptly illustrated in the Beisel case wherein, according to the syllabus, it was held:

"Where the mother of minor children has acted in good faith for their benefit without letters of guardianship, she is chargeable in equity as a *quasi* guardian, or trustee of their estates, and an accounting and settlement of such trust after the issuance of letters of guardianship, is in the nature of an accounting in equity to be determined upon equitable principles; and the court has jurisdiction in such accounting to allow reasonable and proper credits to her for maintenance of the minor children, and for expenditures incurred on their account prior to the letters of guardianship."

But, as stated before, herein the situation called for a special service for the minors and the law required the court to impose that duty upon a special agent, and the court acted in accordance with such mandate of the law, leaving no room for the exercise of such equitable principle. If the guardian *ad litem* had declined or omitted to represent the minors and the mother in order to protect their interests had employed an attorney a different situation might be presented. In such case it would be at least just to allow the attorney employed by the mother the compensation that would otherwise go to the guardian.

We are reluctant to reverse the order since the estate had the benefit of the services, but we see no other alternative. Indeed, nearly all the work required to suitably represent the minors was performed by respondent and his associate. They relieved the guardian *ad litem* to a great extent, but it would be subversive, we think, of the principles that prevail in guardianship matters, to allow this charge against the estate of the minors.

Some other questions are discussed, but we deem it unnecessary to consider them.

The order is reversed.

Hart, J., and Finch, P. J., concurred.