JAMIE LYNN OTT, a Minor, by her Father and Next Friend, Mark Ott, *et al.*, Plaintiffs-Appellants, v. LITTLE COMPANY OF MARY HOSPITAL *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—93—0319

Opinion filed May 26, 1995.—Rehearing denied July 26, 1995.

Robert A. Rosin & Associates, Ltd., of Chicago (Robert A. Rosin and Charles J. Durham, of counsel), for appellants.

Harold L. Jacobson, Hugh C. Griffin, Diane I. Jennings, and Marilee Clausing, all of Lord, Bissell & Brook, of Chicago, for appellee Little Company of Mary Hospital.

Robert P. Huebsch and Michael Resis, both of Querrey & Harrow, Ltd., of Chicago, for appellee Wilfredo Rendon.

Terence E. Flynn, David J. Pritchard, and Marci S. Sperling, all of Gessler, Flynn, Fleischmann, Hughes & Socol, of Chicago, for appellee Paul E. Lawler.

Scott D. Lane, of Lane & Lane, of Chicago, for *amicus curiae*.

JUSTICE GORDON delivered the opinion of the court:

This appeal arises from an order dismissing the medical malpractice action of the minor plaintiff, Jamie Lynn Ott, pursuant to a cash and structured settlement agreement recommended by the court-appointed guardian *ad litem* and approved by the trial court on November 13, 1992. Mark Ott, the minor plaintiff's father and next friend, and the plaintiff's mother,[1] who were the co-guardians of her estate, objected to the terms and refused to consent to the settlement agreement. After the denial of plaintiffs' motions to reconsider and vacate the order of dismissal, on December 21, 1992, the instant appeal was taken. This court granted the motion of the Illinois Trial Lawyers Association to file an *amicus curiae* brief in support of the plaintiffs-appellants.

---

[1]An amended complaint naming Judith Ott, the minor plaintiff's mother, as an additional plaintiff and co-guardian, and a motion to file the same *instanter* were submitted to the trial court at the pretrial conference on April 27, 1992. The trial court determined that the motion would be entertained after settlement discussions were concluded.

Substantively,[2] the instant obstetrical medical malpractice action is premised on actions that allegedly occurred on August 8 and 9, 1983, in connection with the performance of a Caesarean section delivery of the minor plaintiff, Jamie Ott, at defendant Little Company of Mary Hospital by defendant Doctor Paul Lawler, Jr., the attending physician, and by defendant Doctor Wilfredo Rendon, the primary surgeon. After the delivery, on August 8, Jamie was transferred to the neonatal intensive care unit at the birth hospital because of her alleged critical condition due to meconium aspiration. On August 9, approximately 12 hours after birth, Jamie was transferred to the University of Chicago Hospital neonatal intensive care unit. The complaint, consisting of a single count, alleged that, as a result of the defendants' negligent failure to provide adequate medical care at the time of delivery and thereafter, Jamie suffered severe and permanent injuries including a spastic diplegia form of cerebral palsy leaving her unable to properly use her legs and Erb's palsy of the left arm, which prevents her from using that arm. In that single count, Mark Ott also joined his individual claim for medical expenses incurred on behalf of the minor.

Although trial did not commence and no evidence was presented, we must discuss the nature of the liability and injuries in this case as reflected by the parties' extensive pretrial discovery depositions and documents, which were considered by the trial court and the guard-

---

[2]In order to comply with appellate court page limitations specified by revised Supreme Court Rule 23 (Official Reports Advance Sheet No. 15 (July 20, 1994), R. 23, eff. July 1, 1994), discussion of a jurisdiction issue raised by this court *sua sponte* has been designated nonpublishable. Also deleted for purposes of compliance with the page limitations of revised Supreme Court Rule 23 are several substantive issues raised by the plaintiffs; namely, whether the plaintiffs were removed as guardians of the minor's estate without notice and hearing; whether the court erred by prohibiting the plaintiffs from initiating contact with the guardian *ad litem*; whether the trial court engaged in *ex parte* communications with the guardian *ad litem*; and whether the trial court violated an administrative memorandum of the circuit court governing disposition of minor's personal injury cases. A separate discussion of the issues of settlement coercion and adequacy of the settlement amount have been deleted from publication, although a discussion of those issues has been largely subsumed under the remaining issues which have been published. A full and detailed discussion of all these issues can be found in the full decision, including the nonpublishable Rule 23 material, in *Ott v. Little Company of Mary Hospital*, No. 1—93—0319.

ian *ad litem* and made a part of the record,[3] since that becomes the predicate upon which case value may be determined for the purpose of settlement.

Doctor Katherine Mary Peshek-Campbell, Jamie's pediatrician, described Jamie as being intelligent, motivated, socially interactive and well adjusted. She stated, in her deposition, that the spasticity in Jamie's legs had decreased with numerous surgeries and that Jamie was able to ambulate for short distances without assistance, although she required the assistance of a walker for longer distances. Jamie's left arm remained nonfunctional, but she did have use of her left hand.

Plaintiffs' obstetrical expert, Doctor Martin Motew, testified in his deposition and stated he had no criticism of the decision to perform or the timing of the Caesarean section delivery. He was critical of the preparation for and care rendered to Jamie immediately after her birth. He indicated that Mrs. Ott's high-risk, post-date (past 42 weeks gestation) pregnancy and the existence of meconium-stained amniotic fluid were factors that required additional hospital staff and equipment at the time of delivery in anticipation of meconium aspiration by the newborn child. He believed that Jamie had not been properly intubated, to clear her airways of meconium, or evaluated in the delivery room and in the neonatal intensive care unit and that certain necessary equipment was not available in the delivery room at the time of Jamie's delivery. Doctor Motew and Doctor Irving Rozenfeld, plaintiffs' pediatric neurology expert, agreed that the combined hospital records from Little Company of Mary Hospital and the University of Chicago Hospital indicated that Jamie was freely moving her limbs from the time of birth until August 17, 1983, when a finding was made at the University of Chicago Hospital, where Jamie had been transferred on August 9, 1983, that Jamie's left arm had become flaccid. Both doctors questioned the accuracy of those notations, however. Both doctors also agreed that Erb's palsy is caused by trauma or a stretching injury. Doctor Motew stated that it was unlikely that the injury occurred during delivery and stated there was no recorded event in the records that revealed "a causative factor for this paralysis." Doctor Rozenfeld also was unable to formulate an opinion as to the cause of Erb's palsy; stated it was a condition separate and apart from Jamie's symptoms of cerebral palsy; and stated that Erb's palsy was extremely rare in Caesarean section cases.

---

[3]As some settlement negotiations occurred *ex parte* and off the record, the defendants requested and were allowed by the trial court to include a summary of their discussions with Judge Elward in the record.

Defendants' experts stated that Erb's palsy was not related to the care provided to Jamie by the defendants and that whatever trauma caused the injury occurred at the University of Chicago Hospital.

As to the spasticity affecting Jamie's legs, Doctor Motew stated he was not an expert in pediatric neurology and had no opinion as to whether that spasticity was caused by Jamie's meconium aspiration and subsequent respiratory problems. Doctor Rozenfeld's opinion was that Jamie's form of cerebral palsy resulted from a lesion in the brain. He theorized that localized bleeding occurred in the blood vessels in Jamie's brain, as a secondary phenomenon of meconium aspiration and respiratory distress, selectively affecting her lower extremities. He said it was inconceivable that the spasticity in Jamie's legs was due to a spinal cord injury.

Defendants' experts rejected Doctor Rozenfeld's theory because there was no evidence of hypoxia or lack of oxygen in the brain so as to cause a physiologic response. They also rejected the hypothesis of intracerebral hemorrhage because it was anatomically impossible and made no sense neurologically since Jamie's intellect was not affected. Defendants' experts found that results from tests performed on Jamie were more consistent with a spinal cord lesion that could have been caused by trauma similar to the trauma that caused the Erb's palsy or by a prenatal developmental problem.

The record also contained a report prepared by plaintiffs' expert on anticipated safety and health care goods and services which Jamie would require and an accountant's projections of costs for those goods and services.

On April 24, 1992, the instant case was assigned to Judge Paul Elward for trial. As is customary, the trial judge convened a pretrial conference during the course of which he initiated settlement exploration and negotiation. These discussions took place with all parties present and were also pursued, without objection, with each of the parties separately outside the presence of their respective opponents. During the conferences, each of the parties was free to discuss with the trial judge the respective strengths and weaknesses of the case as reflected in the foregoing depositions.

At the pretrial conference, the plaintiffs demanded $4.5 million to settle their lawsuit and rejected all settlement offers made by the defendants. The plaintiffs allege, and it appears undisputed by the defendants, that on the morning of April 27, 1992, the second day of pretrial, Judge Elward indicated to the defendants, during an *ex parte* discussion, that he would settle the case for $2 million present cash value if the defendants offered that amount. Later that morning, he met with Jamie's attorney and her parents and advised them

of his discussion with the defendants, reiterating his statement that he would settle the case if the defendants offered $2 million. The plaintiffs' attorney and the parents objected to the court's actions as they had not authorized the court to make such a demand on their behalf. The defendants subsequently returned to court and advised Judge Elward that they were making a firm offer of a structured settlement with a present cash value of $2 million. That structure included an immediate cash payment of $800,000 and periodic payments to commence immediately which were guaranteed to yield a minimum of $5,412,033 and which could yield in excess of $21 million if Jamie lived her normal life expectancy.[4] Judge Elward again met with Jamie's parents and attorney to convey the settlement offer. In response, they expressly refused to accept that offer. Judge Elward thereupon indicated to the parties that he would nevertheless settle the case and requested that the parties appear in court the next day to make a record and draw an order to effect "the revised settlement that we have reached today."

At the start of the court hearing on April 28, 1992, the trial court stated:

> "This case is settled for two million dollars according to a revised structured settlement, which I find satisfactory, and a guardian ad litem will be appointed in place of the father to accept the settlement. ***
>
> ***
>
> The guardian will be instructed by the Court to review this, will confer with the Court on it, will have the benefit of the rather extensive evaluation that the Court has made of the various plaintiff doctor expert depositions."

Pursuant to the plaintiffs' request and the defendants' consent, Judge Elward again met with the Otts and their attorney in chambers on the afternoon of April 30, 1992.[5] Judge Elward explained the value of the structured settlement to them and discussed potential problems

---

[4] The structured settlement would provided an immediate payment of $1,500 per month, compounded annually at 5%, until Jamie reached age 21; an education fund of $50,000; $52,000; $54,000; and $56,000 paid in the years 2001, 2002, 2003 and 2004, respectively; and deferred lifetime payments in the amount of $6,112 per month, compounded annually at 4%, beginning in 2004, guaranteed for 30 years. Jamie's normal life expectancy was set at 75.41 years.

[5] This meeting occurred in the presence of a court reporter and the discussion was transcribed and made a part of the record on appeal. The request of plaintiffs' attorney to seal the transcript of this *ex parte* discussion was denied.

with proof of causation of the Erb's palsy condition as well as with the cerebral palsy condition. Judge Elward further stated that he could not "let anybody, no matter how well-intentioned or sincere in their convictions, gamble for this child." Despite the court's urging and after taking time to consult with their attorney in private, the Otts returned to open court and refused to accept the defendants' $2 million present cash value settlement offer.

By order dated May 8, 1992, the trial court appointed Frank McGarr, former chief judge of the Federal District Court for the Northern District of Illinois, as guardian *ad litem*; ordered that McGarr be given all medical reports, documents and discovery materials that the court had received; asked the guardian to decide "only whether the proposed settlement [was] in the best interest of the minor"; and asked the guardian to submit a written report with the court. The order further stated that if the guardian did not approve the settlement, "the Court will recuse itself and return this case to the Assignment Judge for trial before another judge." The parties were ordered not to initiate communication with the guardian, although the guardian was permitted to communicate with any party, their agents or attorneys.

On July 16, 1992, the trial court denied the plaintiffs' challenge to the May 8 order and also denied plaintiffs' oral request for a finding that would facilitate the taking of a permissive interlocutory appeal pursuant to Supreme Court Rule 308 (134 Ill. 2d R. 308). On August 27, 1992, the guardian *ad litem* filed his report. Included in the report were the following prefatory remarks:

> "It is clear that the court believes that the proposed structured settlement is in the best interests of Jamie Ott and that Jamie's parents are not acting in their child's best interests by rejecting it. While the court's views deserve deference, the appointment of a Guardian looks to an independent and uninfluenced opinion on the matter and no suggestions to the contrary have been made or implied by Judge Elward.
>
> In preparation for this report, I have had available the entire court file, a large number of deposition transcripts and the April 9 proposed structured settlement programs ***. In addition I have had a conference with all counsel in which their views of the case and the proposed settlement were fully aired."

In his report, the guardian *ad litem* noted the "impressive figures of over five million guaranteed yield, and a potential yield of more than twenty-one million over a full life expectancy." The guardian *ad litem* further noted, however, that, regardless of these figures, the central issue was adequacy of a $2 million payment by the defendants

in view of the plaintiffs' ability to establish liability and prove injuries. With respect to the liability issue, the guardian *ad litem* stated that the evidence "indicates a probable finding of liability on the part of Dr. Lawler and the Hospital, with the probability of a finding of liability against Dr. Rendon somewhat less." The guardian *ad litem* recognized a possible but not a high degree of probability that the triers of fact would find total nonliability and that Jamie's injuries occurred after she left the defendant hospital or that they originated other than during her birth. He also stated that there was a greater possibility that a jury could find that the Erb's palsy was not caused by the defendants and award damages in an amount less than $2 million. He discussed the fact that the settlement offer was sufficient to structure a financial package "to achieve the lifetime benefits to Jamie." The guardian *ad litem* emphasized the desirability of risk elimination to avoid the gamble which would ensue if the case went to trial. He concluded that, taking a conservative view, acceptance of a $2,110,000[6] offer was in the best interest of the child.

On September 4, 1992, the court accepted and approved the report of the guardian *ad litem*; found the recommendations were in the best interest of the child; increased the settlement amount to $2,091,782; and ordered the guardian *ad litem* to execute all necessary documents to settle the case. On October 27, 1992, the court's order was amended *nunc pro tunc* to include a finding by the court that the settlement was fair and reasonable. The court's order of dismissal was entered on November 13, 1992.

On appeal, plaintiffs first argue that the settlement dismissal order was improper where the trial court coerced settlement thereby depriving plaintiffs of their right to trial, improperly removed control of the minor's case from her parents/guardians by appointing a guardian *ad litem*, engaged in extrajudicial communication with the guardian *ad litem*, and approved a settlement amount that was arbitrary and wholly inadequate.[7]

It is the public policy of this State that the rights of minors are to be guarded carefully. (*Mastroianni v. Curtis* (1979), 78 Ill. App. 3d 97, 397 N.E.2d 56.) Every minor plaintiff is a ward of the court when involved in litigation, and the court has a duty and broad discretion

---

[6]Due to a change in interest rates, McGarr estimated that an additional $110,000 would be necessary to achieve the benefits outlined in the defendants' April 29, 1992, proposal. The additional amount subsequently determined by the court and agreed to be paid by the defendants was $91,782.

[7]A discussion of several of these issues has been omitted from the published portion of the opinion rendered in this case. See footnote 2 *supra*.

to protect the minor's interests. (*Burton v. Estrada* (1986), 149 Ill. App. 3d 965, 501 N.E.2d 254.) Concomitant with this duty to protect is the statutory requirement that the court approve or reject any such settlement agreement proposed on the minor's behalf. (*Burton*, 149 Ill. App. 3d 965, 501 N.E.2d 254; *Mastroianni*, 78 Ill. App. 3d 97, 397 N.E.2d 56.) Section 19—8 of the Probate Act of 1975 (hereinafter referred to as the Probate Act) provides:

> "By leave of court *** a representative may compound or compromise any claim or any interest of the ward *** in any personal estate *** upon such terms as the court directs." (755 ILCS 5/19—8 (West 1992).)

In accordance with this provision, the courts have held that the guardian of a minor's estate cannot effectuate settlement without court approval of that settlement. (*Hayes v. Massachusetts Mutual Life Insurance Co.* (1888), 125 Ill. 626, 635, 18 N.E. 322, 326 (interpreting predecessor statute; guardian of minor's estate "required to procure the approbation of the proper court before exercising *** power [to release a demand due his ward]").) Likewise, neither a next friend nor any court-appointed guardian can approve a settlement of a minor's suit except with court approval. (*Leonard C. Arnold, Ltd. v. Northern Trust Co.* (1985), 139 Ill. App. 3d 683, 487 N.E.2d 668, *aff'd in part & rev'd in part* (1987), 116 Ill. 2d 157, 506 N.E.2d 1279; see *Kingsbury v. Buckner* (1890), 134 U.S. 650, 680, 33 L. Ed. 1047, 1059, 10 S. Ct. 638, 648 (citing Illinois law, the Supreme Court stated: "The court, whose duty it is to protect the interests of the infant, should see to it that they are not bargained away by those assuming, or appointed, to represent him").) Similarly, a parent has no legal right, by virtue of the parental relationship, to settle a minor's cause of action, and court review and approval of a settlement reached by a parent also is mandatory. *Pittsburg, Cincinnati, Chicago & St. Louis Ry. Co. v. Haley* (1897), 170 Ill. 610, 48 N.E. 920; *Mastroianni*, 78 Ill. App. 3d 93, 397 N.E.2d 56.

So, too, when the court believes settlement to be in the minor's best interest, the court may order a prior-appointed guardian or conservator to effectuate settlement (*Lyons v. Whittington* (1982), 109 Ill. App. 3d 197, 440 N.E.2d 355 (conservator of incompetent's estate)); and if that person refuses, may appoint a guardian *ad litem* to settle the case on the minor's behalf (*Davis v. Mather* (1923), 309 Ill. 284, 141 N.E. 209 (refusal by prior-appointed conservator of incompetent's estate)). (*Cf. Wascher v. Lundeen* (1961), 32 Ill. App. 2d 239, 177 N.E.2d 40 (trial court's approval of settlement proposed by conservator for estate of incompetent affirmed; appointment of guardian *ad litem* not required where no conflict or good and sufficient reason for

appointment). See also *In re Marriage of Hirsch* (1985), 135 Ill. App. 3d 945, 482 N.E.2d 625 (appointment of guardian *ad litem* to defend interests of ward despite existence of guardian of estate); *Aetna Life Insurance Co. v. Strickland* (1975), 33 Ill. App. 3d 52, 337 N.E.2d 285; *In re Estate of Viehman* (1964), 47 Ill. App. 2d 138, 197 N.E.2d 494 (appointment of guardian *ad litem* to defend minor's interests where previously appointed guardian of minor's estate or conservator of incompetent had interests that conflict with those of the ward). See generally *Hudson v. Thies* (1962), 35 Ill. App. 2d 189, 182 N.E.2d 760, *aff'd* (1963), 27 Ill. 2d 548, 190 N.E.2d 343 (principles involved with conservatorship apply to guardianship).) In *Aetna Life Insurance Co. v. Strickland*, the court specifically rejected appellant's argument that once a guardian has been appointed for the estate of a minor, courts are precluded as a matter of law from appointing a guardian *ad litem* for the minor. (*Aetna*, 33 Ill. App. 3d at 56, 337 N.E.2d at 289.) In making this determination, the court relied on the predecessor statute to section 11—13 of the Probate Act, which currently provides in pertinent part:

> "The representative of the estate of a ward shall appear for and represent the ward in all legal proceedings unless another person is appointed for that purpose as representative or next friend. This does not impair the power of any court to appoint a representative or next friend to defend the interests of the ward in that court, or to appoint or allow any person as the next friend of a ward to commence, prosecute or defend any proceeding in his behalf." 755 ILCS 5/11—13(d) (West 1992).

The court's authority to appoint a guardian *ad litem* for its ward to effectuate and implement a court order made subsequent to a finding of best interest of the ward, when the previously appointed conservatrix of the ward's estate refused to do so, can be found in *Davis v. Mather*. In *Davis*, the trial court appointed the guardian *ad litem* when the conservatrix of the incompetent's estate refused to renounce the will of the incompetent's deceased wife. As the court therein noted:

> "It would seem, therefore, under the authorities and by reason of the statute *** that an election made by a guardian *ad litem* at the direction of a court having jurisdiction of the estate of the ward is valid. *** The conservatrix having refused to do that which was for the best interest of the ward's estate, it was the duty of the probate court to direct a next friend or guardian *ad litem* to act in the name and on behalf of the ward and make such renunciation for him." *Davis*, 309 Ill. at 291-92, 141 N.E. at 211-12.

See *Lyons v. Whittington* (guardian's appeal from trial court order to settle minor's claim); the court stated:

"The court has authority to direct the terms for the settlement of claims of a ward or decedent in any estate proceedings under section 19—8 of the Probate Act of 1975. [Citation.] Illinois courts long ago determined that they had authority to order the compromise of litigation involving minors when settlement is in the best interest of the minor. [Citations.]" *Lyons*, 109 Ill. App. 3d at 202, 440 N.E.2d at 359.

▪ Our review of the trial court's decision to order settlement and appoint a guardian *ad litem* to review and effectuate that settlement in the case *sub judice* begins with a recognition of the general policy of the law to favor compromise and settlement. (*E.g., Hudson v. Thies*, 35 Ill. App. 2d 189, 182 N.E.2d 760.) Counterbalanced against this policy is the right of a party to have his day in court (see *Glenner v. Chicago Transit Authority* (1972), 9 Ill. App. 3d 323, 292 N.E.2d 217 (upon filing of timely motion, *adult* can seek to vacate settlement and exercise right to have trial on merits); Ill. Const. 1970, art. I, § 13). It is uncontroverted, and the trial court so noted, that an injured plaintiff who is a competent adult can reject any settlement offer no matter how advantageous and no matter how risky a trial on the merits could be and that the trial court would have no authority to overrule that rejection. In the case of a minor, as noted above, however, the trial court has a duty to prevent the rejection of settlement offers which in the minor's best interests should be accepted. This duty necessarily impedes upon the minor's parents/guardians' ability to control direction of the case as well as to choose the vehicle for ultimate determination of the minor's rights of recovery.

The court's duty to protect the minor and the powers to perform that duty are not without limit, however. Whether the court, the guardian, or any other representative of the minor initiates the settlement, the court's authority to approve such compromise of a minor's rights extends only to cases where the evidence shows that the compromise is in the best interest of the minor. (*Matthews v. Doner* (1920), 292 Ill. 592, 127 N.E. 137.) This determination must be made within the atmosphere of an adversarial process and within the rules of procedure and evidence. (See, *e.g., Leonard C. Arnold, Ltd. v. Northern Trust Co.* (1987), 116 Ill. 2d 157, 164, 506 N.E.2d 1279, 1281 (public policy "considerations do not evaporate simply because the party in need of legal assistance is a minor").) Within this context, the court is permitted to review the parties' positions, analyze their potential strengths and weaknesses, and estimate probabilities of liability and damage award. (See *Wolf v. Uhlemann* (1927), 325 Ill. 165, 156 N.E. 334; *Lyons v. Whittington*, 109 Ill. App. 3d 197, 440 N.E.2d 355 (doubt or uncertainty as to minor's recovery considered when making best

interest of minor determination); *Hudson v. Thies*, 35 Ill. App. 2d 189, 182 N.E.2d 760 (in personal injury action, court must consider question of liability as well as extent of minor's injuries).) When the court has made such an examination and has determined that settlement, rather than the uncertainties of trial, is in the best interest of the minor, and when that determination is supported by the record, it will be affirmed. *Matthews v. Doner*, 292 Ill. 592, 127 N.E. 137 (court of review will affirm trial court's finding that compromise in best interest of minor where finding is sustained by the evidence). See *Hudson v. Thies*, 35 Ill. App. 2d 189, 182 N.E.2d 760 (decision to approve settlement is left to sound discretion of trial court and will not be overturned unless there is an abuse of discretion).

■ We believe that the record adequately supports a finding that the trial judge made a proper analysis and determination of best interest of the minor. The court examined the parties' positions and trial potentials and considered the wishes of the minor's parents, who were the court-appointed guardians of her estate, and, ultimately, the recommendations of the guardian *ad litem.* Specific factors of import enumerated by the court included potential problems with proof of causation of the Erb's palsy condition as well as the separate and unrelated condition of cerebral palsy. The court also discussed general statistical probabilities of jury verdicts in favor of plaintiffs and the average dollar amounts of those verdicts which, on average, and excluding exceptionally high verdicts that skewed the average, amounted to less than $2 million present cash value. Finally, the court recognized the sincerity of Jamie's parents and their intention to seek the most compensation that they could for Jamie's suffering and rehabilitation but indicated that permitting the case to proceed to trial would be allowing a gamble that could result in total loss on the liability issue or partial loss in the form of a lesser damages award. Based on the uncertainties enumerated, and predicated on the concurrence of the guardian *ad litem*'s report, the trial court maintained its conclusion that it would be in Jamie's best interest to accept the settlement offer. We cannot say that this conclusion was an abuse of discretion.

■ We agree that the trial court's assertion that the case was going to be settled before the guardian *ad litem* was appointed was, under the circumstances, premature. Such a statement, when made prematurely, can foster an impression of being excessively preemptive. (See *People ex rel. Horwitz v. Canel* (1966), 34 Ill. 2d 306, 215 N.E.2d 255.) However, after making that statement, the court clearly backed away from it and proceeded to appoint a highly respected guardian *ad litem* with full and independent authority to determine

best interest, offering recusal if the guardian *ad litem* disagreed with the court's conclusion that the settlement was in the best interest of the child.

We next address plaintiffs' contention that the trial court erred in denying plaintiffs' motion for voluntary dismissal. Plaintiffs filed their motion for voluntary dismissal on September 2, 1992, almost four months after the guardian *ad litem* had been appointed and the date upon which the parties were ordered to appear in court to "act on the Guardian [*ad litem*]'s Report." The court denied the motion because substantive proceedings had taken place and because no notice had been given to the defendants.

In accordance with section 2—1009 of the Code of Civil Procedure (735 ILCS 5/2—1009 (West 1992)), "[t]he plaintiff may, at any time before trial or hearing begins, upon notice to each party who has appeared or each such party's attorney, *** dismiss his or her action *** without prejudice, by order filed in the cause." The plaintiffs rely on this provision and the case of *Kahle v. John Deere Co.* (1984), 104 Ill. 2d 302, 472 N.E.2d 787, which states that, for purposes of a section 2—1009 motion, a trial has not begun, and dismissal is mandatory, where no jury has been selected, where no prospective jurors have been examined or sworn and where no opening statements have been made. The plaintiffs therefore contend that, as no trial had begun in the instant case, the court was required to grant their motion for voluntary dismissal.

We must reject plaintiffs' argument on several grounds. First, at the time the motion for voluntary dismissal had been brought, a guardian *ad litem* for Jamie had been appointed by the court. As noted above, the representative of the estate of a minor can appear for and represent the minor in all legal proceedings "unless another person is appointed for that purpose." (755 ILCS 5/11—13(d) (West 1992).) As further noted above, once appointed, the guardian *ad litem* is charged with defending the interests of the minor. (*McCarthy v. Cain* (1922), 301 Ill. 534, 134 N.E. 62; *Roth v. Roth* (1977), 52 Ill. App. 3d 220, 367 N.E.2d 442; *Rom v. Gephart* (1961), 30 Ill. App. 2d 199, 173 N.E.2d 828.) We believe the appointment of a guardian *ad litem* vests that individual with exclusive authority to proceed on behalf of the minor in the pending lawsuit and operates to derogate and relieve any other person's authority to do so. Such a conclusion is implied from the language of section 11—13 of the Probate Act ("[t]he representative of the estate of a ward shall appear for and represent *** unless another person is appointed for that purpose") (755 ILCS 5/11—13(d) (West 1992)). Moreover, while we have been unable to locate an Illinois case on point, we note the California case of *In re*

*Guardianship of Price* (1923), 61 Cal. App. 592, 215 P. 710, which states:

> "Even if there be a general guardian, the court may, if deemed advisable, appoint a guardian ad litem 'to represent the infant in the action or proceeding.' [Quoting section 372 of the California Code of Civil Procedure, which provides that an infant must appear either by his general guardian or by a guardian ad litem appointed by the court.] \*\*\* [T]here is no possible basis for the claim that one appointed by the court for that very purpose under the sections of the code was not clothed with exclusive power to direct, manage, and control the suit in behalf of said minors. He would be subject to the supervisory authority of the court, but subject to that limitation he is the sole representative of the minors, and no one can divide or diminish his prerogative. In 22 Cyc. 661, it is said: 'His powers are strictly limited to matters connected with the suit in which he is appointed, \*\*\* he is a full representative of the rights and interests of the infant for the particular case in which he is appointed, and is clothed with as full and perfect authority for that suit as the general guardian is for all the duties incident to his office.'
>
> \*\*\*
>
> In other words, the authority of the guardian ad litem in relation to the suit is equal to what would be the authority of the ward if he were an adult. Manifestly this would be inconsistent with the authority of any other person \*\*\* in such litigation." (61 Cal. App. at 598-99, 215 P. at 712-13.)

The case of *In re Price* dealt with the issues of whether the guardian *ad litem*, without court authority, or the minors' mother, as a quasi guardian of her minor children, could engage the services of a law firm to represent the minors in their action. The court held that the guardian *ad litem*, an attorney himself, was not authorized to enter into a contractual arrangement with the law firm and that the mother had no authority to do so since the "sole power to represent the minors was committed into the hands of the guardian ad litem." 61 Cal. App. at 598, 215 P. at 712.

Other cases to recognize the guardian *ad litem*'s authority to control the litigation include *Kollsman, a Division of Sequa Corp. v. Cohen* (4th Cir. 1993), 996 F.2d 702, *In re Christina B.* (1993), 19 Cal. App. 4th 1441, 23 Cal. Rptr. 2d 918, *Woods v. State* (1952), 207 Okla. 1, 249 P.2d 99, and *In re Guardianship of E.B.* (1989), 152 Vt. 608, 568 A.2d 399 (guardian *ad litem* is best suited to determine what course to follow on behalf of minor). In this regard, it has been stated that the guardian *ad litem* can waive a jury as that decision is a trial tactic involving procedure subject, however, to court review for fair-

ness. (*Robinson v. Wilson* (1974), 44 Cal. App. 3d 92, 118 Cal. Rptr. 569; *Cloud v. Market Street Ry. Co.* (1946), 74 Cal. App. 2d 92, 168 P.2d 191; see *Dacanay v. Mendoza* (9th Cir. 1978), 573 F.2d 1075 (guardian *ad litem* traditionally lacks any personal authority to prejudice the substantial rights of the minor litigant).) As stated in *Kingsbury v. Buckner* (1889), 134 U.S. 650, 680, 648, 33 L. Ed. 1047, 1059, 10 S. Ct. 638, 648 (guardian *ad litem* can consent to case being heard in certain division of State supreme court):

"It is undoubtedly the rule in Illinois, as elsewhere, that a next friend or guardian *ad litem* cannot, by admissions or stipulations, surrender the rights of the infant. The court, whose duty it is to protect the interests of the infant, should see to it that they are not bargained away by those assuming, or appointed to represent him. But this rule does not prevent a guardian *ad litem* or *prochein ami* from assenting to such arrangements as will facilitate the determination of the case in which the rights of the infant are involved."

■ It is clear from the above-cited case law that once the trial court appointed a guardian *ad litem* in the instant case, the authority to pursue the minor's rights rested exclusively with the guardian *ad litem* and, therefore, Mark Ott could not bring a motion on behalf of the minor to voluntarily dismiss the minor's lawsuit. Subject to the supervisory authority of the court, the guardian *ad litem* was the sole representative of the minor and had exclusive power to direct, manage and control the lawsuit on behalf of the minor. Here, the guardian *ad litem* did not join in the section 2—1009 motion nor was there any finding that the dismissal was in the best interest of the child (see *Robinson v. Wilson*, 44 Cal. App. 3d 92, 118 Cal. Rptr. 569). Quite to the contrary, both the guardian *ad litem* and the court concluded that acceptance of the settlement offer, not a section 2—1009 dismissal, was in the best interest of the minor.

■ We also note that the trial court's denial of the motion for voluntary dismissal may be justified based upon the holding in *Gibellina v. Handley* (1989), 127 Ill. 122, 535 N.E.2d 858, and our conclusion that the instant dismissal motion would have sanctioned an unwarranted utilization of section 2—1009 to forum shop (see also *Kahle v. John Deere Co.*, 104 Ill. 2d at 310, 474 N.E.2d at 791 (Ryan, J., concurring, joined by Moran, J.). As the court noted in *Gibellina*:

"[A]n ever increasing number of plaintiffs are using a section 2—1009 motion to avoid a potential decision on the 'merits' or to avoid an adverse ruling as opposed to using it to correct a procedural or technical defect. [Citations.] It has become clear that the allowance of an unrestricted right to dismiss and refile

an action in the face of a potentially dispositive motion is not only increasing the burden on the already crowded dockets of our courts, but is also infringing on the authority of the judiciary to discharge its duties fairly and expeditiously." (*Gibellina*, 127 Ill. 2d at 137, 535 N.E.2d at 865-66.)

Pursuant to its supervisory powers and managerial authority, the court in *Gibellina* restricted the plaintiff's right to voluntary dismissal even though the plaintiff's statutory right to dismissal without prejudice was unrestricted.[8] (See also *Gibrick v. Skolnik* (1993), 254 Ill. App. 3d 970, 627 N.E.2d 76 (voluntary dismissal pursuant to section 2—1009 after trial has commenced).) Although *Gibellina* was decided in the context of the filing of a section 2—1009 motion during the pendency of a defense motion, which if favorably ruled upon would have been dispositive of the case, there is merit in the contention that it also should be applicable to the instant case. It can be argued that at the time the plaintiffs' section 2—1009 motion was tendered, the trial court had pending what was tantamount to a *sua sponte* motion to approve the guardian *ad litem*'s report and recommendation of settlement, itself a dispositive motion.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

COUSINS, P.J., and McNULTY, J., concur.

---

[8]Though not relevant to the instant appeal, it should be noted that supreme court's intervention in *Gibellina v. Handley* (1989), 127 Ill. 2d 122, 535 N.E.2d 858, pursuant to its supervisory powers has now been incorporated by our legislature via amendment to section 2—1009 of the Code of Civil Procedure (735 ILCS 5/2—1009 (West Supp. 1993)). See Pub. Act 88—157, eff. January 1, 1994.