2024 IL App (2d) 230294-U
No. 2-23-0294
Order filed January 31, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* M.B., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| | ) | |
| | ) | No. 22-JA-131 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Brittany W., | ) | Reginald C. Matthews, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Presiding Justice McLaren and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err when it permitted the State to amend the adjudicatory petition after the commencement of the adjudicatory hearing but prior to the court's ruling.

¶ 2    Respondent-Appellant, Brittany W., appeals from the trial court's order permitting the State to amend its petition for adjudication of wardship and temporary custody hearing and thereafter adjudicating the minor, M.B., neglected. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    M.B. was born to Brittany on August 28, 2022. That same day, a call was made to the State Central Registry indicating that Brittany had given birth. Brittany had an open case with the Illinois

Department of Children & Family Services (DCFS) when she gave birth to M.B. On August 31, 2022, the State filed a petition for adjudication of wardship and temporary custody (Petition) alleging that M.B. was neglected (705 ILCS 405/2-3(1)(b) (West 2022)) in that M.B. "is a minor under 18 years of age whose environment is injurious to his/her welfare in that his/her mother and/or father have a history of mental illness and/or his/her mother and/or father have been found unfit in Lake County case numbers [*sic*] 19JA200 and have not been restored to fitness."

¶ 5     An adjudicatory hearing was held over the course of four dates: May 23, 2023, May 24, 2023, June 8, 2023, and June 28, 2023. When the hearing commenced on May 23, 2023, the State first called Matt Rodriguez to testify. Rodriguez stated that he was an investigator with DCFS and he was assigned to Brittany's case. Rodriguez reported to Rush Copley Medical Center on the day Brittany gave birth to M.B. and he spoke with Brittany that day. Rodriguez testified that Brittany was dishonest with hospital staff and refused to provide hospital staff or DCFS with her real name. Brittany denied having another child and denied ever having been involved with DCFS. Rodriguez testified that the case was thereafter reassigned and he was no longer involved in the matter.

¶ 6     The State next called Kimberly Watts. Watts testified that she is a clinical social worker and the Director of Mental Health and Peer Support services at Nicasa Behavioral Health Services (Nicasa). Watts supervised an individual who performed a global evaluation of Brittany on March 13, 2022. Watts did not read the report but was verbally advised of its contents. Watts testified that after the global evaluation, Brittany was advised to seek services for mental health and substance abuse treatment.

¶ 7     The State then called Jennifer Larson to testify. Larson related that she is a licensed clinical social worker and a clinical supervisor at Nicasa. Larson became involved with Brittany's case when Brittany requested a review of her global evaluation. Larson stated that after reviewing the

assessment, she recommended that Brittany obtain a DUI evaluation in addition to the mental health and substance abuse treatment. This DUI evaluation was recommended at the time of the review because Larson became aware that Brittany had been arrested for driving under the influence. Later, when Brittany's DUI was amended to a negligent driving charge, Larson removed this recommendation.

¶ 8    The State then called Angela Shumate. Shumate testified that she was a DCFS investigator and took over the investigation of Brittany's case. Shumate's report was admitted into evidence.

¶ 9    The State next called Officer Bradstreet of the Lake Zurich Police Department. Bradstreet testified that on September 4, 2021, she picked up Brittany from Good Shepherd Hospital to transport Brittany to the Lake Zurich Police Department for booking related to an incident that had occurred the day before. Bradstreet testified that during the booking process, Brittany banged her head against a concrete table twice before Bradstreet told Brittany to stop, at which point Brittany complied. Bradstreet testified that she asked Brittany about an incident with a four-year-old resident at the Liberty Lakes Apartments, and Brittany replied with a statement along the lines of, "if a four-year-old kicks me, I will kick a four-year-old back," while kicking and punching the air. Brittany then told Bradstreet to "hurry up" with the booking process, so that she could go home and overdose and kill herself. Bradstreet testified that after booking, the Lake Zurich Fire Department was called to transport Brittany to Good Shepherd Hospital for a psychological evaluation.

¶ 10    The State next called Officer Kingery of the Lake Zurich Police Department. Kingery testified that he was called to Brittany's apartment on January 16, 2022. When Kingery arrived, he met with Brittany in the front lobby. Brittany told Kingery that M.B.'s father, Joshua B., was inside the apartment. Kingery was unaware whether Joshua lived in the apartment with Brittany.

Brittany advised Kingery that she told Joshua that she no longer wanted to be in a relationship and Joshua punched her in the nose and stomach and pushed her into a piece of furniture. Kingery testified that Brittany told him that Joshua punched her in the stomach so that she would have a miscarriage. At this point, counsel for Brittany objected, arguing that Kingery's testimony was irrelevant, as the State's Petition did not allege a history of domestic violence. The State countered that the Petition alleged a failure to comply with services and that domestic violence would be tied in as one of the services. The State argued that the testimony regarding alleged domestic violence was for the purpose of demonstrating that domestic violence treatment was a necessary service. After hearing arguments, the trial court sustained the objection. The court then recessed for the day and continued for hearing on the following day, May 24, 2023.

¶ 11 When the matter reconvened on May 24, 2023, the State filed a motion to amend its Petition. The State also filed an amended petition for adjudication of wardship (count I) that alleged that M.B. was neglected (705 ILCS 405/2-3(1)(b) (West 2022)) in that M.B. "is a minor under 18 years of age whose environment is injurious to his/her welfare in that his/her mother and/or father have a history of mental illness *and/or domestic violence* and/or his/her mother and/or father have been found unfit in Lake County case numbers [*sic*] 19JA200 and have not been restored to fitness" (emphasis added). The trial court held a hearing on the State's motion to amend. In support of amending the Petition, the State cited section 2-13(5) of the Juvenile Court Act of 1987 (Act), which states:

> "The court shall liberally allow the petitioner to amend the petition to set forth a cause of action or to add, amend, or supplement factual allegations that form the basis for a cause of action up until 14 days before the adjudicatory hearing. The petitioner may amend the petition after that date and prior to the adjudicatory hearing if the court grants leave to

amend upon a showing of good cause. The court may allow amendment of the petition to conform with the evidence at any time prior to ruling. In all cases in which the court has granted leave to amend based on new evidence or new allegations, the court shall permit the respondent an adequate opportunity to prepare a defense to the amended petition." 705 ILCS 405/2-13(5) (West 2022).

The State then argued that the previous day the objection to evidence of domestic violence had been sustained, but it asserted that "all evidence relevant to the neglect of the minor should be presented to the court" in the hearing. The State contended that counsel for Brittany had received a witness list with the officer's names and police reports, so that there should not have been any surprise as to the testimony they sought to elicit. Further, the State offered that it would be willing to give counsel for Brittany additional time to prepare a defense to testimony that would be presented if the motion to amend was granted. Finally, the State argued that it believed the amendment to be in the best interest of M.B.

¶ 12    Counsel for Brittany objected to the motion to amend the State's Petition. In support, counsel noted that while the court shall liberally allow amendments up to 14 days prior to the adjudicatory hearing, the parties were about to begin the second day of the hearing. As such, counsel argued that the State needed to demonstrate good cause to amend the Petition and the State had failed to demonstrate any good cause. Counsel argued that the parties had been in court regarding this matter on many occasions prior to the adjudicatory hearing and that the State could have amended the Petition on any one of those occasions. Counsel suggested that the statute did not contemplate motions to amend like the State's, because the State here decided it didn't "care for the ruling," so it "amend[ed] the Petition so all the stuff becomes relevant in the middle of the case."

¶ 13    The trial court granted the State's motion to amend the Petition. In issuing its ruling, the trial court read through the statute and determined that, with regard to amending petitions, the statute contemplates a

> "situation where you are already in the trial. The trial is proceeding but now evidence comes about, but the petition does not conform with the evidence that came around. That's when you get into 'the Court may allow amendments of the petition to conform with the evidence at any time prior to ruling.' "

Because the court found that the State was planning to amend the Petition to conform to the evidence that the State sought to elicit through testimony and because the court had not yet issued its ruling in the adjudicatory hearing, the trial court found that an amendment was appropriate and granted the State's motion. The trial court also found that allowing the State to amend the Petition served the best interest of M.B.

¶ 14    After ruling on the motion to amend, the adjudicatory hearing resumed. The State called Rebecca Tittle to testify. Tittle stated that she is a case worker at Camelot Care Center and was the case worker for Brittany and M.B., as well as for Brittany and another child, T.C., as of January 2022. The order of adjudication and the ruling and disposition from T.C.'s case were admitted into evidence, as well as a mandate from the appellate court in T.C.'s case. Tittle testified that she was the case worker involved with rating the service plans in February 2022 and August 2022. Both of the plans were admitted into evidence, as well as permanency orders from March 2022 and September 2022. Tittle testified that she monitored Brittany for a neuropsychological assessment and a Parenting Capacity Assessment, which encompassed individual therapy, substance abuse services, and domestic violence services. Tittle testified that domestic violence services were added in February 2022 when she became aware of domestic violence between Brittany and Joshua

through a records request to the Lake Zurich Police Department. In March 2022, Brittany was referred to A Safe Place for victim services, however, Brittany instead completed a perpetrator assessment in June 2022. After another incident of domestic violence occurred, Brittany was again referred for domestic violence services at Renacer Latino in August 2022. Tittle testified that Brittany had not completed the new domestic violence evaluation, domestic violence treatment, or substance abuse treatment by the time M.B. was born. Tittle testified that Brittany did submit to drug testing weekly and tested negative via at home tests. Tittle further testified that Brittany was referred to the Josselyn Center for individual therapy but did not complete therapy there. Instead, Brittany attended Campuzano Clinical Services and then Roan Solutions to complete her individual therapy goals before M.B. was born. However, Brittany was then referred for additional therapy. Tittle testified that Camelot Care Center recommended Brittany complete a Parenting Capacity Assessment because DCFS wanted more testing. Tittle recalled scheduling the Parenting Capacity Assessment for Brittany in March 2022. The assessment was then rescheduled because DCFS recommended that Brittany first complete the neuropsychological assessment before the Parenting Capacity Assessment. Brittany did not receive the neuropsychological assessment until September 2022, after M.B. was born. Tittle further testified that Brittany denied being pregnant when Tittle asked in June or July of 2022, and Brittany did not call Tittle after giving birth to M.B. Tittle also testified that between the time that T.C.'s case opened in August 2019 and M.B.'s birth in August 2022, Brittany only had supervised visits with T.C. Tittle stated that of the 11 visits offered between September 2021 and March 2022, Brittany attended three. Of the 22 visits offered between March 2022 and August 2022, Brittany attended eight. Tittle was the only witness called on May 24, 2023.

¶ 15    The adjudicatory hearing resumed on June 8, 2023. The State first called Officer Kourtev of the Lake Zurich Police Department. Kourtev testified that he was called to Brittany's apartment on January 3, 2022. When he arrived, he saw both Brittany and Joshua but spoke with Brittany first. Kourtev testified that Brittany told him that Joshua struck her with his fists and cut her hand with a knife. Kourtev saw the injury to her hand but saw no other visible injuries. Kourtev testified that he then spoke with Joshua. Joshua stated that Brittany had jumped or stomped on Joshua, hit him in his back with a metal chair, and damaged his gaming console as well as some of his games. Kourtev observed the damaged property in the apartment. Kourtev observed no injuries on Joshua, and Joshua stated that he did not know what Brittany was talking about regarding the knife. Kourtev testified that he listened to the recording of the 911 call and identified the voices of Brittany and Joshua. Kourtev heard Joshua's voice asking if Brittany was going to hit him with a chair.

¶ 16    The State next called Officer Young of the Lake Zurich Police Department. Young testified that he was called to Brittany's apartment on May 28, 2022, for a domestic battery report. Young testified that Brittany was the only person at the apartment when he arrived. She told him that Joshua struck her with an open hand, punched her, and took her phone. Young testified that Brittany told him that Joshua came over to get some property and the two got into a physical altercation. During the altercation, Joshua told Brittany that he would give her a miscarriage because she did not want to be with him. Young did not see any injuries on Brittany but observed that the apartment was in disarray. Brittany also disclosed another domestic battery incident that occurred in Wisconsin in April. Although Young was unable to locate Joshua that day, Joshua went to the police office that night. Joshua admitted to pushing Brittany, slapping her, and taking her phone so that she would listen to him.

¶ 17    The State then called Officer Heer of the Lake Zurich Police Department. Heer testified that he was called to Brittany's apartment on June 7, 2022. He stated that Brittany was reporting a domestic dispute with Joshua. Brittany told Heer that Joshua damaged her Nintendo Switch. Heer verified that the Switch was broken. He also observed that Brittany was bruised on her arms and legs. When Heer later spoke with Joshua, Joshua told him that Brittany was the aggressor. Heer saw scratch marks on Joshua's face, arms, and neck.

¶ 18    The State then called Joshua. Joshua testified that he began dating Brittany in 2021 and lived with her from summer of 2021 until January 2022. Joshua testified that he recalled several incidents of domestic violence prior to M.B.'s birth. He maintained that Brittany was the aggressor in certain incidents, but conceded that he had slapped, pushed, and hit Brittany while she was pregnant. Joshua testified that he was in jail following the May 28, 2022, incident and at the time of M.B.'s birth. He stated that despite a no-contact order between Brittany and Joshua following the May 28, 2022, incident, Brittany was contacting him through the jail. Joshua testified that he was concerned about his own ability to take care of M.B., as well as about Brittany's ability to do so. He testified that he believed Brittany would not be able to take care of M.B. because of Brittany's mental health. Joshua was the last witness to testify on June 8, 2023.

¶ 19    On June 28, 2023, the parties reconvened for hearing. The State admitted into evidence a certified conviction for Joshua. Defense entered into evidence certified court records from Brittany's DUI. All parties rested, and arguments of counsel were heard.

¶ 20    At the close of the adjudicatory hearing, the trial court reaffirmed its decision to allow the State to amend its Petition to include allegations of domestic violence. The court determined that there was no "testimony regarding a history of mental illness suffered by the mother that would create an anticipatory injurious environment for the minor." The court stated that it was "going to

hang its decision on the latter part of [the] petition, in that the mother and/or father have a history of domestic violence." The court identified the testimony of multiple officers regarding incidents of domestic violence between Brittany and Joshua which ended in violence while Brittany was pregnant with M.B. It also noted that the parties had not shown an ability to refrain from constant communication with one another despite a no-contact order and the violence between them. Finally, the court took account of the fact that Brittany had been found unfit in her case with T.C. and had still not completed the services required of her in that case. Based on the foregoing, the court adjudicated the minor neglected. It is from this order that Brittany appeals.

¶ 21　　Brittany contends that the State should not have been allowed to amend its petition, as the petition was not defective in the first place. Relatedly, she argues that at the time of filing the amended petition, the State was not conforming the pleading to the proofs, as no evidence of domestic violence had been admitted yet. She further argues that she was both surprised and prejudiced by the proposed amendment. Because the petition did not originally allege domestic violence as a ground for neglect, Brittany claims that her "counsel proceeded to trial on the well held belief that the State would be required to meet their burden as to the allegations made in the petition the State filed." Thus, she argues that "counsel was certainly surprised to learn that the State intended to call witnesses to testify to matters that counsel correctly deemed to be irrelevant," that this caused her prejudice in proceeding because counsel was no longer prepared for the hearing, and that asking for more time to prepare would delay Brittany's case. She also contends that the amendment caused her prejudice because the court rested its decision largely based on the evidence elicited after the amendment to the petition. Finally, Brittany argues that the amendment was clearly untimely, and the State had several opportunities to amend the petition prior to commencement of the adjudicatory hearing.

¶ 22                                    II. ANALYSIS

¶ 23    "All proceedings under the Juvenile Court Act of 1987 [(Act)] (705 ILCS 405/1-1 through 7-1 (West 2022)) are brought in the best interests of the child involved and should not be undertaken lightly. At an adjudicatory hearing, a trial court must determine whether a minor is abused, neglected, or dependent and the State must prove its allegations by a preponderance of the evidence. [citation]." *In re C.M.*, 351 Ill. App. 3d 913, 916 (2004). A trial court's finding is afforded great deference and will not be disturbed unless it is contrary to the manifest weight of the evidence. *Id.*

¶ 24    Section 2-13(5) of the Act states:

"The court shall liberally allow the petitioner to amend the petition to set forth a cause of action or to add, amend, or supplement factual allegations that form the basis for a cause of action up until 14 days before the adjudicatory hearing. The petitioner may amend the petition after that date and prior to the adjudicatory hearing if the court grants leave to amend upon a showing of good cause. The court may allow amendment of the petition to conform with the evidence at any time prior to ruling. In all cases in which the court has granted leave to amend based on new evidence or new allegations, the court shall permit the respondent an adequate opportunity to prepare a defense to the amended petition." 705 ILCS 405/2-13(5) (West 2022).

¶ 25    "In order to determine whether the trial court abused its discretion, the reviewing court must look at four factors established in *Kupianen v. Graham*, [107 Ill. App. 3d 373 (1982)] and adopted by our supreme court in *Loyola Academy v. S & S Roof Maintenance, Inc.*, [146 Ill. 2d 263, 273-74 (1992)]." *In re Tyrese J.*, 376 Ill. App. 3d 689, 701 (2007).

"These factors are: (1) whether the proposed amendment would cure the defective pleading, (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment, (3) whether the proposed amendment is timely, and (4) whether previous opportunities to amend the pleading could be identified." *Loyola Academy*, 146 Ill. 2d at 273.

¶ 26    In analyzing whether the court abused its discretion in permitting the amendment to the State's petition, we find *In re Tyrese J.*, 376 Ill. App. 3d to be instructive. In that matter, the court denied the State's motion to amend its petition at the close of evidence. *Id.* at 702. The trial court concluded that the State had no good explanation for amending the petition. *Id.* The amendment was untimely, and the State had identifiable opportunities to amend the petition prior to its request at the close of evidence. *Id.* On review, this court reversed the trial court's decision. *Id.* at 703. Despite the untimeliness of the amendment and the fact that "the State had no good explanation for waiting until the close of evidence to seek leave to amend the petition," the reviewing court determined that there was good cause to amend the petition because the "focus of the hearing is the best interests of the minor and [the minor] should not suffer the consequences for [the State's] error." *Id.* at 702-03.

¶ 27    In finding that good cause existed, the reviewing court noted that "every minor plaintiff is a ward of the court when involved in litigation, and the court has a duty and broad discretion to protect the minor's interests." *Id.* at 703, citing *Ott v. Little Company of Mary Hospital*, 273 Ill. App. 3d 563, 570-71 (1995). Thus, on review, the reviewing court held that:

"the circuit court has an obligation to intervene when a minor's representative fails to protect his interests. [The minor] should not be called upon to answer for the State's mistakes at a cost of being placed in an injurious environment when there is no reasonable

explanation for the State's omission. The circuit court should have either allowed the State to correct the mistake that it admitted or amended the petition *sua sponte*. Doing so would have been in harmony with the purpose of the Act and in accordance with its duty to protect a minor's interest." *In re Tyrese J.*, 376 Ill. App. 3d at 703.

¶ 28    Turning to the instant matter, we agree with Brittany that there were occasions prior to the commencement of the adjudicatory hearing where the State could have amended the petition. Further, while the amendment was not time-barred, amending the petition mid-hearing certainly lacked diligence. However, considering the other factors under the lens of the minor's best interests, we do not find the trial court's decision to be an abuse of discretion.

¶ 29    First, we do not find that Brittany was unfairly surprised or prejudiced by the amendment to the petition. The State provided counsel with a witness list prior to the adjudicatory hearing that named all of the police officers who responded to the incidents of domestic violence between Brittany and Joshua. In addition to the witness list, the State also tendered all reports. Further, after the amendment to the petition was permitted by the court, the State offered counsel additional time to prepare for the testimony related to domestic violence. Moreover, counsel had over two weeks from the May 24, 2023, date when the petition was amended to the June 8, 2023, date when those officers were called to testify, prepare. Counsel had nearly three weeks from the June 8, 2023, date to the June 28, 2023, date for additional preparation. "Although the fairness to the parties is not irrelevant by any means, we find this basis to be insufficient under the circumstances of this case." *Id.* at 702.

¶ 30    Finally, we address Brittany's argument that the amendment to the State's petition was made so that the petition conformed to the evidence that the State was seeking to elicit, not to the evidence that the State has already presented. We conclude that the amendment was made to

conform the petition to the evidence and was made in support of M.B.'s best interest. The State elicited testimony from Tittle that she had obtained police reports related to domestic violence. Although this testimony technically occurred after the petition had been amended, the testimony was not admissible only because the petition had been amended to include the allegation of domestic as Brittany contends. Instead, this testimony related to evidence that Brittany had not completed her domestic violence treatment. Regarding the evidence that was only admissible after the petition had been amended, "the circuit court has an obligation to intervene when a minor's representative fails to protect his [or her] interests." *Id.* In this case, the trial court indicated that it needed evidence that was "relevant *** as to what constituted that domestic violence that was contained in [the] reports [Tittle ordered] so the court [could] determine" the nature of the domestic violence between Brittany and Joshua. Like *In re Tyrese J.*, M.B. "should not be called upon to answer for the State's mistakes at the cost of being placed in an injurious environment." *Id.* at 703. After the amendment, the State provided evidence that M.B.'s environment was injurious to her welfare in that there existed a history of domestic violence and Brittany had not completed the domestic violence services as directed. Thus, the court acted in M.B.'s best interest and was obliged to do so.

¶ 31 Because we do not find that Brittany was prejudiced or surprised by the amendment and that the amendment protected M.B. from an injurious environment, we conclude that the trial court did not abuse its discretion in allowing the State to amend its petition. Accordingly, we do not disturb the trial court's ultimate finding in adjudicating the minor neglected.

¶ 32                                III. CONCLUSION

¶ 33 Based on the foregoing, we affirm the judgment of the circuit court of Lake County.

¶ 34 Affirmed.